992 So.2d 848 (2008)
Robert BURKELL, Appellant,
v.
STATE of Florida, Appellee.
No. 4D06-1153.
District Court of Appeal of Florida, Fourth District.
October 1, 2008.
Rehearing Denied November 14, 2008.
Carey Haughwout, Public Defender, and Tatjana Ostapoff, Assistant Public Defender, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Daniel P. Hyndman and Mitchell A. Egber, Assistant Attorneys General, West Palm Beach, for appellee.

*849 On Motion for Rehearing

TAYLOR, J.
We grant the state's motion for rehearing, withdraw our prior opinion, and substitute the following in its place.
Robert Burkell was indicted for first degree murder of Charles Bertheas. A jury found the defendant guilty as charged and the trial court sentenced him to life in prison without parole. The defendant appeals the denial of his motion for judgment of acquittal, arguing that the evidence presented in his case was wholly circumstantial and that this evidence was insufficient to support his murder conviction because it did not exclude every reasonable hypothesis of innocence. We disagree and affirm the conviction.
Defendant lived with his wife, three children, and the victim, Charles Bertheas, in a four-bedroom single-family home in Tamarac, Florida. Mr. Bertheas, an eighty-one year old man from France, was befriended by appellant and allowed to live in a room attached to appellant's house for eight months before his murder. Defendant converted the family room into a bedroom and living room area for Mr. Bertheas.
On Sunday, November 23, 2003, at approximately 2:20 p.m., paramedics responded to a 911 call placed from the defendant's residence. They were met there by the defendant. The defendant told the paramedics that he had found Mr. Bertheas dead in his bedroom when he went to check on him around 2:15 p.m. that afternoon. He was concerned because Mr. Bertheas did not appear for lunch. The defendant said he last saw the deceased alive the night before. That night, the defendant and the deceased had met for drinks and dinner at the Hurricane Bar in Sawgrass Mills, but had returned home at 8:30 p.m. He stated that the victim went to his room at that time.
When the paramedics entered Mr. Bertheas's room, they saw a body lying on the floor face up, with dry blood around him. Broward County Paramedic Rafael Droz observed the pooling of blood in the body and rigor mortis and estimated that the victim had been dead for at least a couple of hours. He noted that the room was well lit although the blinds on the windows were closed. The paramedic called the Broward Sheriff's Office (BSO) for further investigation.
Deputy Anthony DeGrace arrived on the scene at 2:25 p.m. He entered Mr. Bertheas's bedroom through double French doors. The exterior walls of the room consisted of two sets of sliding glass patio doors with screen doors and vertical blinds. These doors were partially blocked by plywood and locked. In a small area just outside the French doors, which led into the main quarters of the residence, was a sliding glass door that led to the backyard. It was open but the screen door was closed and locked. Deputy DeGrace said he had no difficulty seeing inside the room where the deceased was found because daylight was coming into the room. Due to the extensive amount of blood found at the scene, Deputy DeGrace summoned additional units to the scene.
As the deputy was sealing off the room as a crime scene and the paramedics were leaving, Deputy DeGrace noticed a commercial steel flashlight. The defendant told him that it was his flashlight and that he had retrieved it before entering the room because he needed it to see the body. He repeated this account in a taped sworn statement given at the scene.
The crime scene investigation revealed that there were no signs of forced entry into the victim's room or signs of a struggle and that no valuables had been taken *850 from the victim. The victim's wallet, keys, and credit cards were all found in his room. Detective Carmody interviewed the defendant at the scene. The defendant told him that the victim had been drunk when he last saw him the night before. He speculated that the victim may have struck his head and fallen while inebriated.
The victim had a large pool of blood around him. The detective observed considerable trauma to the victim's face and head. The medical examiner, Dr. Erosten Price, came to the scene and examined the body. Based on the blunt head trauma injuries that could not be explained by a simple fall, she concluded that the manner of death was homicide. After conducting an autopsy of the victim, the medical examiner placed the time of death within one hour of consuming food and concluded that the victim had a .10 blood alcohol level.
In addition to multiple lacerations and extensive bruising, the victim had been struck in the eye with sufficient force to rupture it. Dr. Price found extensive fractures to the victim's facial bones. The anterior base of his skull was also crushed. The cause of death was blunt force trauma to the head caused by between fourteen and eighteen blows, including massive blows to the frontal area.
On November 24, 2003, the day after the police were initially contacted, investigators found three "bare sole impressions" (footprints) in dried blood adjacent to the area where the body was found. After foot impressions of all the residents in the home were taken, a state's forensic expert identified two of those footprints as belonging to the defendant. Police investigators also retrieved the black sandals which the defendant said he was wearing when he found the victim's body. In the master bathroom, which the defendant's wife testified was used only by her and the defendant, blood stains found on a bath mat and the master bath counter top were analyzed for DNA. The DNA profile matched a mixture of both the defendant's, as a major donor, and the victim's, as a minor donor. The defendant's wife testified that the victim used the bathroom in the center of the home.
Further investigation revealed that the defendant forged the victim's signature on a check that was drawn on the victim's account at Bank of America and made out to the defendant in the amount of $10,000. On November 21, 2003, the day before the murder, the defendant deposited the check in his own account at Wachovia Bank. The victim had given the defendant a power of attorney in a document dated September 26, 2003. However, as a Bank of America employee explained, this only authorized the defendant to present the power of attorney to the bank, sign a signature card, and then sign his own name to checks being drawn on the account. The investigation also showed that the victim had two Bank of America accounts containing over $280,000 at the time of his death. As the defendant informed the first officer on the scene, the defendant and his wife were named as beneficiaries of the victim's last will and testament, which the defendant kept in his safety deposit box.
After the state rested its case, and after the defense rested without presenting any evidence, the defendant moved for judgment of acquittal. The trial court denied the motion and the jury found the defendant guilty of first degree murder. On appeal, the defendant argues that the court erred in denying his motion for judgment of acquittal because the case against him was based entirely on circumstantial evidence that was insufficient to support his conviction for first degree murder.
*851 Appellate review of the denial of a motion for judgment of acquittal is de novo. Reynolds v. State, 934 So.2d 1128, 1145 (Fla.2006) (citing Pagan v. State, 830 So.2d 792, 803 (Fla.2002)), cert. denied, ___ U.S. ___, 127 S.Ct. 943, 166 L.Ed.2d 721 (2007). The standards for evaluating a motion for judgment of acquittal are well-established:
Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. If, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. In moving for a judgment of acquittal, a defendant `admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.' We have stated that `courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.'
Id. (citations omitted)
"However, where a conviction is based wholly upon circumstantial evidence, a special standard of review applies." Reynolds, 934 So.2d at 1145-46 (quoting Darling v. State, 808 So.2d 145, 155 (Fla. 2002)). Darling states that "a motion for judgment of acquittal should be granted in a case based wholly upon circumstantial evidence if the state fails to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt." Darling, 808 So.2d at 155-56 (quoting State v. Law, 559 So.2d 187 (Fla. 1989)).
At the outset, the state asserts that the evidence presented in this case was not entirely circumstantial; that direct evidence, consisting of footprint and DNA analysis, contributed to the jury's verdict. The state thus argues that we need not apply the special standard of review applicable to circumstantial evidence cases in considering the trial court's denial of defendant's motion for judgment of acquittal.
To support his argument that the evidence presented in this case was insufficient for a conviction, the defendant relies mainly on Ballard v. State, 923 So.2d 475 (Fla.2006). Ballard was a case based upon purely circumstantial evidence. Id. at 482. Even assuming, for the sake of argument, that the case against Burkell was also circumstantial, Ballard is clearly distinguishable. In Ballard, the defendant's hair and fingerprints were found in the bedroom where the murder victims were discovered. The Florida Supreme Court noted that the hair and fingerprint evidence comprised the entire circumstantial case against Ballard and held that these items were insufficient to establish the defendant's guilt. Id. at 483. The court stated: "Given the evidence of Ballard's frequent and personal access to the premises, the State simply could not refute the possibility of his prior innocent presence in the bedroom as accounting for the hair and print. The fingerprint and hair evidence only serves to prove that Ballard was in Jones and Patin's apartment at some point in time, which Ballard readily admits because he was a long-time friend of the couple and socialized regularly with them." Id. at 484.
This case, however, differs from Ballard. Here, defendant's bare footprints were left in the victim's dried blood and could have been impressed there only during or after the murder; thus, unlike the fingerprint and hair evidence in Ballard, *852 the footprint evidence established a timeline placing defendant at or near the murder scene. This timeline directly contradicted defendant's version of events: that the only time he entered the victim's room was when he discovered the body (about eighteen hours after the murder) and that he was wearing sandals at that time.
In ruling on a motion for judgment of acquittal, "[t]he sole function of the trial court ... is to determine whether there is a prima facie inconsistency between (a) the evidence, viewed in the light most favorable to the state and (b) the defense theory or theories. If there is such inconsistency, then the question is for the finder of fact to resolve." Orme v. State, 677 So.2d 258, 262 (Fla.1996).
In this case, the defense theory or hypothesis of innocence was that an intruder entered the Burkell residence and killed Charles Bertheas. The state presented evidence which, when viewed in the light most favorable to the state, conflicted with the defendant's hypothesis of innocence. As mentioned above, the state introduced the defendant's statement to police that he was wearing sandals when he found the body. This was inconsistent with evidence of the defendant's bloody bare footprints at the scene.[1] Also, contrary to the defendant's statement to police that the victim's bedroom was so dark when he discovered the body that he needed a flashlight to see it, three witnesses for the state testified that there was plenty of natural light in the room that afternoon, as well as artificial lighting that could have been used if necessary. Although it is not clear why the defendant would lie to the police about the flashlight, the inconsistency could suggest either that the defendant never even entered the room that afternoon when he called 911, that he was in the room the night before when the victim was murdered, or that the flashlight may have been used as the murder weapon. In any event, this conflict between the defendant's version and the testimony of three witnesses created a jury question. See Norton v. State, 709 So.2d 87, 91 (Fla. 1997) (holding that eyewitness's testimony that he saw defendant and the victim together near the time of the murder, at a time when defendant claimed to be at home asleep, was sufficient to avoid judgment of acquittal).
Significantly, the police testified that there was no evidence of forced entry anywhere in the home and, more specifically, no sign of entry or exit through the sliding glass doors of the victim's bedroom. Furthermore, the defendant's statement to police that he believed the decedent hit his head in a drunken fall could be construed by the jury as a deliberate attempt to deceive the police. See, e.g., Walker v. State, 495 So.2d 1240, 1241 (Fla. 5th DCA 1986) (holding that evidence that defendant had lied to police to defeat or avoid prosecution was admissible as showing consciousness of guilt).
Finally, financial incentives, including defendant's deposit of the victim's $10,000 check into the defendant's personal account the day before the murder established a motive for the crime. In sum, the evidence outlined above was sufficient to justify denial of the motion for judgment of acquittal.
Affirmed.
*853 SHAHOOD, C.J., concurs.
FARMER, J., dissents with opinion.
FARMER, J., dissenting from rehearing.
The State's argument for rehearing is founded on a catachresis. It argues that the opinion reversing the conviction was based on a legal error because it changed the burden of the state to disprove every reasonable hypothesis of innocence into disproving a plausible hypothesis of innocence. Obviously in context plausible was used as a synonym for reasonable. In each the thought is that the State's burden of proof is to eliminate any theory of innocence conceivable from the evidence presented.[2] To require the State to disprove a theory of innocence demands that the theory be at least possible. Why would the State have to disprove a defense that "Superman did it"? Why should the State have to disprove obviously implausible explanations of non-guilt?
Sadly, the majority have succumbed. Nothing in the replacement opinion for the court fills the hole in the State's proof. When were the footprints made? What evidence suggests they were made peri-mortem? Because there is none, I am forced to the conclusion that guilt was not proved. I therefore reprint below the analysis used in the original opinion of the court reversing the conviction.

. . .
On Sunday afternoon the Frenchman was found in his room beaten to death. He had been bludgeoned with repeated blows to the head, but no weapon was ever identified or found. Death came some 18 hours before he was discovered. He was last seen around 8:30 on Saturday evening.
He had lodging in a four-bedroom house with a family of father, mother, two adult sons, and teenaged daughter. It was the father who discovered the body. Father and daughter were in the house with decedent all night on Saturday. Mother was also there but left for a brief period to visit a friend.
The man's room had two sets of sliding glass doors, none of which were locked. Other doors leading into the family room of the house were also unlocked. Nothing suggested forced entry. But at least twelve latent fingerprints from the scene could not be matched to the man or any member of the family.
The dead man's blood was found on the corner of a coffee table in his room and on the floor. Prints from the father's heel and toe were found in the blood on the floor. The evidence did not explain when the prints were madewhether at the time of death or sometime later. Police also retrieved specks of blood belonging to the Frenchman and the father from a floor mat in the bathroom and its sink. The evidence did not show when or how these specks of blood were placed in the bath.
The man and the father had dinner together in a restaurant on the evening before his body was discovered. They usually dined together twice per week. The Frenchman was said to have a prickly personality, but there was no hint of friction or tension between them. A barmaid who saw them that night and on other occasions described the father as a gentleman. To her the Frenchman did not seem a happy man.
*854 The father had remodeled his house to provide lodging to the man. He, on the other hand, had given the father his power of attorney. The father had cashed a $10,000 check drawn on the man's account on the day before death. The father was a beneficiary in the man's will. The Frenchman left an estate of nearly $300,000.
The father was indicted and convicted of first degree murder. The issue is whether the evidence was enough to find him guilty.
In assessing the sufficiency of the evidence as a matter of law, the court must decide whether the State produced competent, substantial evidence contradicting the presumption of innocence. State v. Law, 559 So.2d 187, 189 (Fla.1989). There is a special standard of review when a conviction is based entirely on circumstantial evidence. Law, 559 So.2d at 188; Jaramillo v. State, 417 So.2d 257 (Fla.1982). If the only proof of guilt is circumstantial, a conviction cannot stand if the evidence fails to contradict any reasonable hypothesis of innocence. Law, 559 So.2d at 188; McArthur v. State, 351 So.2d 972 (Fla. 1977); Mayo v. State, 71 So.2d 899 (Fla. 1954). Recently in a case of "purely circumstantial" evidence the court said:
"`Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.' Similarly ... we [have] held that `the circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences.' Suspicions alone cannot satisfy the State's burden of proving guilt beyond a reasonable doubt, and the expansive inferences required to justify the verdict in this case are indeed improper." [e.s., c.o.]
Ballard v. State, 923 So.2d 475, 482 (Fla. 2006).
The State's principal argument is that the evidence is not purely circumstantial. It contends that the footprint and blood-DNA evidence are, taxonomically, direct evidence. The State is only partially correct. Footprints and blood-DNA may operate as direct evidence for some specific issues. For example, footprints may directly establish a person was at a certain place in spite of denying ever being there. Blood-DNA analysis may settle the identity of the one contributing a specimen.
But here the State relied on these two kinds of evidence to prove something beyond mere presence or identity. The State asked the jury to infer from the footprints and blood-DNA evidence that it was the father who had committed premeditated murder. Hence the motion for judgment of acquittal properly required the judge to determine if this evidence satisfied the unique burden of circumstantial evidence.
The State's case depends on the inference that the prints were made by the murderer. It is common knowledge that blood does not dry instantly, that it remains semifluid for varying periods depending on its quantity and ambient conditions. Here there was no evidence as to the quantity of blood, the ambient conditions, or how long it had been on the floor *855 when the print was made. Not a single expert witness ventured an opinion as to when the footprints were made. No one said they could have been made only when the murder was committed. Indeed at oral argument the State candidly acknowledged the lack of evidence that the footprints could have been made only then.
The footprints in the blood place the father in the room, but they alone do not tell us when he was there or what he did when he was there. The blood specks in the bathroom reveal only that grown men may leave specks of blood in their bath. Alone, neither tends to show that it was the father alone who bludgeoned the man to death.
By itself it is not especially remarkable that the father's footprint was in the room. The father and the decedent had their abode in the same house. Admittedly, the father told police he thought he was wearing sandals, not in his bare feet, when he discovered the body. Yet even though police took possession of those sandals along with several articles of his clothing, the State presented no evidence at trial about them. The record fails to show whether blood was found on them or not.
The State analogizes the footprint to fingerprints. We accept the analogy. At the same time, the State relies on Tirko v. State, 138 So.2d 388 (Fla. 3d DCA 1962), which also held that the State must prove that the fingerprints were left only at the time of the murder. To be able to draw the inference that the footprints were made at the time of death, the State had to adduce further evidence as to the critical element of timing. The State did not do so.
The State's evidence also did not contend with the fact that the doors to the Frenchman's room were unlocked, thus providing entry and escape to and from the place of death. The State's evidence fails to explain who could have left at least twelve latent fingerprints at the scene not belonging to anyone who lived there. Further, the police described a bloody scene and a violent attack, but the evidence fails to explain the absence of blood-stained clothing or any traces of blood in the fingernail scrapings removed from the father. Nor does the State's evidence explain the absence of other signs of blood outside decedent's room besides the specks recovered from the bath.
We think this is a case of striking analytical similarity to Ballard. There the presence of the defendant's arm hair in one of the victim's hands and his fingerprints in the bedroom where the bodies were found was not sufficient to avoid a judgment of acquittal. The Court explained:
"Given the evidence of Ballard's frequent and personal access to the premises, the State simply could not refute the possibility of his prior innocent presence in the bedroom as accounting for the hair and print. The fingerprint and hair evidence only serves to prove that Ballard was in [the victim's] apartment at some point in time, which Ballard readily admits because he was a long-time friend of the couple and socialized regularly with them."
923 So.2d at 484. Here too the father had "frequent and personal access" to the room. Here too nothing explains the timing of the footprint or the presence of the incongruous fingerprints. Here too there is no eyewitness to the crime, no one explaining its preparation, execution or aftermath; no admissions by defendant; no suspicious conduct by defendant; no evidence of hatred or ill feeling toward the victim; no murder weapon. Id. In short, a finding of guilt would require a significant sorites of linked inferences (what Ballard *856 refers to as "stacking") from just the proven fact of blood-DNA or footprints.
The law deems circumstantial evidence legally sufficient only because it has eliminated every plausible theory of innocence. Ballard, 923 So.2d at 482; Wright v. State, 348 So.2d 26 (Fla. 1st DCA 1977). The State's evidence in this case did not eliminate every plausible theory of innocence. Suspicions may be weighty enough to stimulate further investigation but not to validate a conviction. Cox v. State, 555 So.2d 352 (Fla.1989).
NOTES
[1] In his closing remarks, defense counsel suggested that the defendant could have been mistaken about wearing sandals when he found the victim's body. He asked the jury "Is it reasonable that after he saw what had happened that he walked out and put his sandals back on?" In any event, whether to attribute a conflict in the evidence to a mistake was for the jury to decide.
[2] See MERRIAM-WEBSTER UNABRIDGED DICT. (CD-ROM ed.) [key word plausible] ("3a: superficially fair, reasonable [e.s.]"). See also AMERICAN HERITAGE DICT. (3d ed.) 1388 ("SYNONYMS: plausible, believable, colorable, credible. The central meaning shared by these adjectives is: `appearing to merit belief or acceptance': a plausible pretext; a believable excuse; a colorable explanation; a credible assertion.").