FARMER, J.
 

 Defendant was charged and convicted of three counts of animal fighting for events occurring on a single day in April. Among other things, he appeals the refusal to suppress evidence because a search warrant was invalid and, alternatively, a denial
 
 *358
 
 of a judgment of acquittal because the evidence was legally insufficient to support the conviction. Although we agree with both, the latter requires that he be acquitted and discharged.
 

 According to testimony of an investigating officer, she found over 100 animals on his property. In the backyard she found individually caged juvenile roosters, hens and chicks, dogs and parrots. In the garage she found adult roosters all individually caged in pens, travel boxes, and cardboard boxes. Several of the roosters she found had been trimmed and dubbed- — • meaning their feathers, combs, and wattles had been removed, which reduces the weight of the rooster and helps prevent overheating. One of the roosters had blood on his face.
 

 She found a bag in the home containing lighters, glue sticks, elastic, nail clippers and butane. She testified that the glue sticks are used to attach spurs to the rooster and the nail clippers are used to trim the rooster’s natural spur. Another bag found in the garage held “identibands” to identify individual birds, teasers used to bait another rooster, sparring muffs which guard the rooster’s artificial spur so that it cannot injure its handler, duct tape to protect the rooster’s beak, a stopwatch, ointments and medications, and needles. One of the bottles contained a thick gel which could be used to stop bleeding quickly in fighting roosters. The bag contained antiseptic ointment which could be used for treating wounds and insulin syringes which could be used for injecting steroids. She also found testosterone which could be given to roosters to enhance their aggression. She recovered a blue travel bag commonly used to transport roosters because it keeps them quiet and is less noticeable than a cardboard box. Artificial spurs were also recovered from defendant’s kitchen.
 

 The officer never witnessed any animal fighting during any of her visits to the property. Nor did she witness anyone baiting or attempting to induce birds to fight. Because of the particular breed of the birds, she conceded that if housed together in one cage they would kill each other. She admitted that the proper way to keep these birds was in separate cages. She admitted that arenas are typically used when the birds fight but there was no arena on defendant’s property. Particular breeds of roosters are trimmed and dubbed to signify them breed, similar to trimming certain breeds of dogs. Roosters are also trimmed and dubbed to prevent overheating and mites. Thus, the fact that the roosters in the garage were trimmed and dubbed does not refute innocent possession of such fowl. She had none of the seized items tested for blood. Although she had a CD of video surveillance from the property, she never watched it.
 

 Another officer testified and recounted the items found in defendant’s home discussed by the previous officer. She explained how each item could be used in rooster fighting. She testified she observed B-12 vitamins and hormones on the property, that these are often used to increase lactic acid buildup in the muscles increasing stamina and decreasing fatigue. She decided to arrest defendant because of the items found on his property but never witnessed him training any birds to fight. Nor did she witness any act of animal fighting while she was on the property. She interviewed defendant at the police station, an audio tape of which was played for the jury. In the tape, defendant explains he was'preparing to move all of his fowl to a larger property owned by a family friend because he knew his chickens were bothering his neighbor. Defendant also explained that he used to bring some
 
 *359
 
 of the items found in his home to the Dominican Republic for his brother to use in cockfights there.
 

 A man who had worked for defendant for three years testified he was there seven days a week caring for the animals. He never witnessed any birds being trained to fight or actually fighting.
 

 The President of the Florida Delegation of the Game Bird Breeders Association testified about the game fowl breed. Game fowl is a particular type of domesticated poultry, he explained, suitable for the sport of cock fighting, but they are also used in shows. Game fowl’s natural instinct is to fight other fowl; hence it is appropriate to transport or keep them caged separately. He pointed out that fowl are trimmed to promote fertility and to control mites and are dubbed in order to promote fertility and vigor and prevent fowl pox. The fowl’s natural spur is commonly trimmed in order to prevent injury to the bird’s handlers. Muffs are also put on the birds in order to prevent injury to handlers. Various vitamins, including B-12, are used to promote health in the roosters and testosterone is commonly used to increase fertility. Supplements often labeled and marketed for cock fighting are simply high potency vitamins that are good for promoting the general health of farm fowl. He admitted during cross-examination that the stop watch, thread, and artificial spurs are not necessary for showing game fowl.
 

 Defendant himself testified that he had owned roosters since he was very young in the Dominican Republic. After coming to the United States, he moved to Florida in 1992 when he learned that it was legal to own and breed roosters in Florida. Since 1992, he had owned about 1,500 roosters. He returns to the Dominican Republic about once a year and had visited there one month before the April search of his residence. Cock fighting is legal in the Dominican Republic. He admitted he attended cock fights while there. He conceded he brought some vitamins and supplements for his animals back in the duffel bags recovered by the authorities. He gave them to his animals to keep them healthy. The pill packs labeled with statements regarding cock fighting were purchased in a Palm Beach County feed store and were given to the birds to keep them healthy. He did not give his roosters the supplements to help them fight. He had never “fought” his roosters. He used the Quick Stop gel to stop the bleeding that often occurred after he clipped animals’ nails. He trimmed and dubbed his roosters for looks, breeding purposes, and to help them eat without wattles getting in the way.
 

 Because police officers continuously visited him and threatened that they would one day gain access to his property, about a month before the execution of the search warrant defendant installed a surveillance system consisting of eight cameras. He reviewed the footage of the 28 days leading up to the execution of the search warrant and saw no animal fighting and no baiting of the roosters. Portions of the video were played for the jury and depicted his employee caring for roosters on a daily basis. It also showed defendant filing a rooster’s spur and placing a muff over it so his son could hold the fowl for the first time. The stuffed animal roosters the officer testified could be used for baiting were a gift defendant brought for his son from the Dominican Republic and a souvenir meant to bring a breeder good luck. The artificial spurs recovered from his kitchen drawer were intended to make a necklace.
 

 The Animal Fighting Act provides:
 

 
 *360
 
 (3) Any person who knowingly commits any of the following acts commits a felony of the third degree ...:
 

 (a) Baiting, breeding, training, transporting, selling, owning, possessing, or using any wild or domestic animal for the purpose of animal fighting or baiting;
 

 (b) Owning, possessing, or selling equipment for use in any activity described in paragraph (a);
 

 (c) Owning, leasing, managing, operating, or having control of any property kept or used for any activity described in paragraph (a) or paragraph (b);
 

 (d) Promoting, staging, advertising, or charging any admission fee to a fight or baiting between two or more animals;
 

 (e) Performing any service or act to facilitate animal fighting or baiting, including, but not limited to, providing security, refereeing, or handling or transporting animals or being a stakeholder of any money wagered on animal fighting or baiting;
 

 [[Image here]]
 

 (g) Betting or wagering any money or other valuable consideration on the fighting or baiting of animals; or
 

 (h) Attending the fighting or baiting of animals.
 

 Notwithstanding any provision of this subsection to the contrary, possession of the animal alone does not constitute a violation of this section.
 

 § 828.122, Fla. Stat. (2007). Two things are clear from this statute. The first is that mere possession of the fowl is not evidence of the crime; the second is that all of the offenses within include the element- of animal fighting or baiting. We conclude that this statute requires some evidence of animal fighting or baiting beyond mere possession.
 

 A trial court’s ruling on a motion for judgment of acquittal is reviewed de novo.
 
 Burkett v. State,
 
 992 So.2d 848, 851 (Fla. 4th DCA 2008). In cases where guilt is based entirely on circumstantial evidence, a judgment of acquittal should be granted “if the state fails to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt.”
 
 Id.
 
 (quoting
 
 Darling v. State,
 
 808 So.2d 145, 155-56 (Fla.2002)). As the court explained in
 
 State v. Law,
 
 559 So.2d 187 (Fla.1989), the state is required to introduce competent, substantial evidence inconsistent with defendant’s theory of events. 559 So.2d at 189.
 

 Defendant’s testimonial evidence of defense was that he never had any intent to use his birds in illegal animal fighting. Defendant adduced positive evidence that he owned the birds solely as pets, as he had his entire life, and that his birds were not used for fighting or baiting. Moreover he adduced evidence that the materials found on his premises and the condition in which the fowl were being kept was consistent with his evidence of mere possession without fighting or baiting.
 

 The State argues his theory of defense was refuted by the recovery of a stop watch from one of the duffel bags located on defendant’s property and a bird who had blood on his face when the search warrant was executed. We conclude that the recovery of the stop watch and the bird with blood on the face are not legally sufficient, competent evidence inconsistent with his testimony.
 
 Law,
 
 559 So.2d at 189. Under the statute defining the crime being tried and the burden imposed by the cases, the State was required to produce additional evidence directly refuting defendant’s evidence.
 
 See Johnston v. State,
 
 863 So.2d 271, 284 (Fla.2003) (reasoning
 
 *361
 
 that defendant’s testimony explaining presence of fingerprints at scene in circumstantial evidence case imposed burden on State rebutting explanation to make prima facie case of guilt);
 
 Jaramillo v. State,
 
 417 So.2d 257 (Fla.1982) (circumstantial evidence that defendant’s fingerprints found at murder scene insufficient to support first-degree murder convictions where State failed to adduce evidence fingerprints could have been placed only when murder committed). The failure of the state to do so means that the trial court erred in denying the motion for judgment of acquittal.
 

 Reversed for judgment of acquittal.
 

 HAZOURI, J., and BOWMAN, JOHN B., Associate Judge, concur.