TAYLOR, J.
James Graham appeals his conviction and sentence for first degree murder with a firearm. He argues that the trial court erred in: (1) denying his motion for judgment of acquittal because the evidence was insufficient to support premeditation for first degree murder and to prove robbery as a predicate offense for felony murder, and (2) admitting a prior consistent statement of the state’s main witness. We affirm.
On the evening of June 30, 2007, Fort Lauderdale police officers found Alvin Daniels dead, with a single gunshot to the chest, lying slumped over the center console of his Jeep Grand Cherokee parked outside his Lauderhill apartment. Officers searched the entire car, but could not find the victim’s wallet or car keys. Although the victim had a cell phone case on his belt, no cell phone was found inside or near the car. The officers were, however, able to obtain the victim’s cell phone records; they learned that his last phone call was made to an individual named Eric McNair. Their investigation later revealed that Phillip Kenneth Watson, a coworker of McNair, told a friend, Mark *99 Martin, about what he heard and saw on the night of the murder.
The police contacted Watson and interviewed him on numerous occasions, but he consistently denied knowing anything about the incident. As a result, detectives asked Watson’s godmother, Theresa Martin, to secretly record a conversation between her and Watson about what he knew of the murder. Martin agreed, and on July 12, 2007, she recorded Watson’s account of the events that occurred on the night of the murder. Two weeks later, on July 24, 2007, police interviewed Watson. He initially denied knowing anything about Daniels’s murder, but he later changed his statement after the police played the recorded conversation between him and Martin. The information he disclosed directly implicated the defendant in the murder and led to his arrest.
At trial, Watson testified that after work on June 30, 2007, he walked to McNair’s home to get change for a twenty-dollar bill. His co-worker, Daniel LaTorre, was there playing a video game in McNair’s bedroom. Watson stayed and watched La-Torre play the video game while he waited for his change. While there, Watson became aware that someone was at McNair’s front door. Although Watson did not see the person standing on McNair’s porch, he recognized the person’s voice as that of the defendant. Watson overheard the defendant, also known as “Slick,” ask McNair for some “fire” or “heat.” Watson said that “heat” means a gun. LaTorre testified that he did not see or overhear the defendant speak to McNair.
Immediately after requesting the gun, the defendant left McNair’s home, but returned about ten minutes later. According to both Watson and LaTorre, the defendant was “breathing hard” and acting “hyper” and “nervous.” LaTorre testified that the defendant moved around fast and said “I got to go.” Watson testified that the defendant confessed that “he just shot the dude in the chest and he’s gasping for air.” Watson also overheard the defendant say that, “he just shot the dude in the chest by accident, and he told everybody to leave.” At that point, Watson observed the defendant pull out a revolver from behind his back and hand it to McNair as Watson walked out of the bedroom. Watson testified that he thought the defendant shot the victim because “he was like trying to get something from him. He was trying to fight with him to get something.” After he left McNair’s house, Watson did not see the defendant, but he saw McNair drive off in a van.
During cross-examination of Watson, the defense implied that Watson’s fear of the police and their threats to arrest him for perjury or homicide influenced him to change his story that he knew nothing about the murder and implicate the defendant during the later portion of the July 24th police interview. On re-direct examination of Watson, the state questioned him about the secretly recorded conversation with his godmother on July 12th. The tape revealed that Watson told his godmother that the defendant came to McNair’s house and said that he had shot a guy in the chest and that he was gasping for air. He stated that he had seen the defendant return a gun to McNair.
The victim’s step-sister, DeWonda Chambers, testified that she had twice seen the defendant over at the apartment she shared with her step-brother in June 2007 and the two appeared to know each other. After the murder, Chambers recalled that the victim’s Figaro gold necklace was missing from his belongings. He frequently wore the necklace, but it was nowhere to be found after his death.
The defendant’s ex-girlfriend, Tamara Tompkins, testified that on July 12, 2007, *100 she pawned a men’s gold necklace that she found inside the drawer of her living room wall unit. According to Tompkins, she had seen the necklace around her apartment in May-prior to June 30, 2007. However, the state published to the jury a taped jail house conversation in which the defendant told Tompkins that she needed to immediately get the necklace back from the pawn shop and to “read between the lines.” In another conversation, the defendant told Tompkins to get the necklace because he did not want her to “get caught up in whatever.”
Leroy Allen Keating, an employee of the pawn shop, recalled from the form Tompkins signed at the time of the transaction that she pawned a men’s Figaro gold necklace similar in style to the victim’s and received two hundred dollars for it on June 12, 2007. Keating acknowledged that there was an unknown amount of gold Figaro chains in the Fort Lauderdale area, but said that there were not many chains that were 10 karat yellow gold, 20 inches in length, and styled for men, which fit the description of the necklace pawned by the defendant’s girlfriend and the necklace worn by the victim.
Alice Benitz, a fingerprint examiner with the Fort Lauderdale police department, found that three fingerprints lifted off the passenger door handle of the victim’s vehicle matched the defendant’s fingerprints. Although the defendant’s fingerprints were found at the scene, crime scene investigator, Brad Jenkins, did not find evidence of a gun, shell casings, or bullets in the vehicle’s vicinity, other than the bullet removed from the victim’s chest. However, Erica Lawton-McWhite, a firearms examiner with the Broward Sheriffs Office, testified that not finding shell casings at the crime scene was consistent with the type of bullet fired and the type of revolver used in the shooting. McWhite explained that the bullet found in the victim’s chest would be fired from a revolver that would not leave shell casings in its vicinity.
After the state rested and the defense rested without presenting any evidence, the defendant moved for a judgment of acquittal. The trial court denied the motion. The jury found the defendant guilty of first degree murder, and the trial court sentenced him to life imprisonment.
On appeal, the defendant argues that the trial court erred in denying his motion for judgment of acquittal because the case against him was based entirely on circumstantial evidence that was insufficient to support his conviction for first degree premeditated murder and felony murder.
Appellate review of the denial of a motion for judgment of acquittal is de novo. Burkett v. State, 992 So.2d 848, 851 (Fla. 4th DCA 2008). The principles that govern a motion for judgment of acquittal are well-established:
Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. If, after -viewing the evidence in a light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. In moving for a judgment of acquittal, a defendant “admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.” We have stated that “courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to *101 the opposite party can be sustained under the law.”
Id. (citations omitted).
However, when a case is completely based on circumstantial evidence rather than on direct evidence, a special standard of review applies. Id. When circumstantial evidence provides the sole proof of guilt, “no matter how strongly it suggests guilt there can be no conviction unless the evidence is inconsistent with every reasonable hypothesis of innocence.” Horne v. State, 997 So.2d 1262, 1265 (Fla. 4th DCA 2009). As such, in cases that solely rely on circumstantial evidence, the state is required to provide substantial competent evidence rebutting the defendant’s theory of events. Reynolds v. State, 934 So.2d 1128, 1145 (Fla.2006). While the state does not have to rebut every possible event variation that might be inferred from the evidence, it has to produce evidence that contradicts the defendant’s theory. Haugabrook v. State, 827 So.2d 1065, 1068 (Fla. 2d DCA 2002). However, mere suspicions without more cannot satisfy the state’s burden of proving guilt beyond a reasonable doubt. Ballard v. State, 923 So.2d 475, 482 (Fla.2006). And the fact that a defendant produced “contradictory evidence as to guilt does not necessarily mandate reversal because the circumstantial evidence rule does not require the jury to believe the defendant’s version of the facts where the State has produced conflicting evidence.” Woods v. State, 733 So.2d 980, 986 (Fla.1999). After “competent, substantial evidence has been submitted on each element of the crime, it is for the jury to evaluate the evidence and the credibility of the witnesses.” Holton v. State, 573 So.2d 284, 290 (Fla.1990) (quoting Hufliam v. State, 400 So.2d 133, 135-36 (Fla. 5th DCA 1981)). A court should not grant a motion for judgment of acquittal unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law. Geffkin v. State, 820 So.2d 331, 835 (Fla. 4th DCA 2002).
The state argues that this is not a wholly circumstantial case, as the defendant contends. We agree. Watson’s testimony established that the defendant came to McNair’s home requesting a gun, left the house, and returned five minutes later. He was sweating, breathing hard, and acting nervous. He stated that he had just “shot the dude in the chest by accident” and that the “dude was gasping for air.” Watson saw the defendant remove a pistol or revolver from behind his back and start to hand it to McNair. The defendant’s fingerprints were found on the passenger side door handle of the victim’s car. The car was located a few yards from McNair’s house.
In this case, although there was insufficient evidence from which the jury could infer premeditation, the state presented competent substantial evidence to support its felony murder theory based on robbery. Trial testimony indicated that the defendant took the victim’s gold chain at the time of the victim’s murder. The victim’s step-sister gave him a Figaro gold chain that he wore often. The chain was not found on him or in his belongings after his murder. Recorded portions of two jail phone conversations between the defendant and his girlfriend showed that the defendant was upset that the girlfriend had pawned a similar gold chain she found in the apartment that she shared with the defendant. Reasonable inferences arose from the evidence that the defendant took the gold chain from the victim at the time of the murder. Additionally, Watson testified about his belief that the defendant was trying to fight with the victim to get something from him. Thus, we find no error in the trial court’s denial of the defendant’s *102 motion for judgment of acquittal on the first degree murder charge.
The defendant also argues that the trial court erred in allowing the state to question Watson regarding his prior consistent statements. The statements were made on July 12, 2007 during a secretly recorded conversation between Watson and his godmother. Although the tape recording was not played for the jury, the defendant argues that the trial court erred in allowing the state to question Watson about the prior statements because they were inadmissible hearsay and improperly bolstered his credibility.
Our standard of review of the trial court’s decision to admit Watson’s prior consistent statement is abuse of discretion. Tumblin v. State, 29 So.3d 1093, 1100 (Fla.2010). “ ‘Generally, prior consistent statements are inadmissible to corroborate or bolster a witness’s trial testimony’” because they are usually hearsay, but a prior consistent statement may be admitted as nonhearsay if certain conditions are met.” Id. (quoting Taylor v. State, 855 So.2d 1, 22-23 (Fla.2003)). Under section 90.801(2)(b), Florida Statutes (2008), prior statements of a witness that are “ ‘[cjonsis-tent with the declarant’s testimony and are offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication’ are not inadmissible hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement.” Id. Both conditions must be satisfied to admit a prior consistent statement as non-hearsay. Peterson v. State, 874 So.2d 14, 17 (Fla. 4th DCA 2004) (citing Harris v. State, 843 So.2d 856, 862 (Fla.2003)).
Here, both conditions were met for the admission of Watson’s statement. First, Watson’s statements in the July 12th recording were consistent with his testimony at trial and he was subject to cross-examination regarding these prior consistent statements. Second, defense counsel’s cross-examination of Watson expressly or impliedly charged that Watson’s testimony was improperly influenced by police threats and intimidation. The underlying theme throughout the defense cross-examination was that Watson would tell the police exactly what they wanted to hear in order to avoid being charged with the homicide.
In response, the state questioned Watson on redirect examination about the July 12, 2007 recorded statement to show that Watson’s trial testimony, along with the statements made in the second portion of the July 24, 2007 interview, were not the product of police threats, but rather an independent account of what happened on the night of the murder — free from any kind of improper motive, influence, or fabrication. We conclude that the trial court did not abuse its discretion in allowing the state to question Watson about his prior consistent statement.
Accordingly, we affirm the judgment of conviction and sentence in this case.

Affirmed.

GROSS, C.J., and STEVENSON, J., concur.