TAYLOR, J.
Defendant Jarod W. Theophile appeals his conviction and sentence for robbery with a firearm. We reverse and remand for discharge because the evidence was legally insufficient to convict the defendant as a principal on the robbery charge.
Dwight Carter, the fifty-three-year-old victim, testified that on May 17, 2009, just before 8:00 p.m., he was riding his bicycle on Australian Avenue in West Palm Beach. He had just left his girlfriend’s apartment and was on his way to the Majestic gas station store. He rode past a bus stop, where he noticed three young men on bicycles. He paid little attention to them until he saw that they were riding in his direction and were behind him. As Carter got closer to the store, they sped up. The young men reached Carter at the same time and surrounded him — one went to his left, one went directly behind him, and one went the other way and continued riding ahead. The man who stopped behind Carter had a gun and told him to pull between two buildings and keep riding or else he would shoot. Carter stopped and jumped off his bike. He described the gun as a two-shot silver Derringer.
Carter held his hands up. One of the two men pointed the gun at him while the other man searched his pockets. The man who was searching Carter told the man with the gun, “you ought to shoot him anyway.” Carter protested “no, man, you got everything you want, just let me go.” The men took $40, threw Carter’s wallet and watch on the ground, and then rode back to the sidewalk and off to a nearby bridge.
The defendant, the third bicyclist who had continued riding ahead when the two men stopped Carter, had gone around the corner nearly a block away to a small bridge. Carter said he saw the defendant on his bicycle looking back and watching while he was being robbed. The defendant just looked and did nothing to help Carter or stop the robbery. Carter said he never heard the defendant say or do anything during the robbery, but he could see him standing at the bridge looking back. After the two men robbed him, they rode to the bridge where the defendant was watching on his bicycle. The three men then rode their bicycles down the railroad tracks.
Carter picked up his things and ran to a phone to call 911. The police responded and took Carter to a park a few miles away near the railroad tracks. There, Carter identified three people as the ones who robbed him. He identified co-defendant Avery Hubbard as the person who searched him and Jaron Miller as the man with the gun. He identified the defendant as the person who rode by and watched from the bridge while he was robbed. Carter was positive that the defendant was not one of the two men who took him between the buildings and searched him at gunpoint. Carter also identified the bicycles. Only fifteen minutes elapsed between the robbery and his identification of the three suspects.
*576 On cross-examination, Carter agreed that when the two co-defendants were searching him at gunpoint, the defendant had already bicycled away to the bridge and traveled about a block away. He conceded that, although he thought the defendant was a lookout, he never heard the defendant say or do anything. He testified as follows:
Defense counsel: Okay. Now, you referred to him as a lookout. Do you — did he do or say any hand gestures or anything that made it look like he knew exactly what was going on?
Carter: Only thing I know, the guy was coming not he bicycle. They all came at the same time, and he was there when I got robbed, and he watched me with my hands up in the air, you know. And when they left, they left — all three left all together the same time they left.
Carter said the defendant was about a block away but he was close enough to see that he was getting robbed. At one point, Carter testified that the defendant “was still riding to the bridge where, you know, he making motions where everybody get surrounded and meet one another at the same time and him keep me from going— being at a safe distance where I couldn’t get away from nobody.” But Carter also admitted that the defendant “never hollered or said anything to anybody, he was just there looking in the crowd.” When asked specifically what the defendant did, Carter replied, “He did nothing. He didn’t say nothing. I don’t know who he was. All I know is he was with the same people that was — when I was getting robbed.” He acknowledged that the defendant left the area where he was robbed and went up the bridge and just looked.
Officer John Rebholz testified that he was on routine patrol when the armed robbery call went out. After receiving the BOLO, he began looking for the suspects. He found three young men in dark clothing riding bikes near 21st Street (Coleman Park) and stopped them. Rebholz spoke with Hubbard. He was present when Carter identified the three co-defendants as the robbers.
Officer William Nealy responded to the area near Coleman Park. He saw that the other officers had three people detained, including the defendant. Nealy began walking from the park back to the robbery location and found six twenty-dollar bills spread out on the ground.
Officer Mickey Allen responded to the armed robbery call near Coleman Park and took custody of the defendant. When he patted down the defendant, Allen found a small caliber handgun in his front right pocket.
Crime Scene Investigator Amy Milstead testified that she photographed and collected six twenty-dollar bills that were all spread out along the railroad tracks. She also took possession of the gun at the station; it was fully loaded.
Detective Craig Bryan took three taped statements from the defendant. In the first interview, the defendant maintained he did not rob anyone. He said he first met with Miller and Hubbard when they came by his cousin’s house and picked him up. They were going to the basketball court. The defendant told Detective Bryan that Miller and Hubbard broke off from him when they got near Carter, and that he kept riding. The defendant denied Detective Bryan’s accusations that he was not telling the truth. When Bryan told the defendant that Carter identified him as the one with the gun, the defendant adamantly denied that. Bryan admitted this was not true. Then the officer suggested to the defendant that as a lookout, and being only eighteen years old, he would stand a good chance of being set free *577 because the State Attorney’s Office did not view the lookout as a person actually committing a robbery. The defendant persisted that he was not a lookout and that he just kept riding away from the others. Throughout the interview, the defendant maintained that he was far away from the area where Carter was robbed and that he was not involved.
In the second taped statement, the officer told the defendant that he was in more trouble because he had the gun in his pocket and one of the co-defendants said he was there. Defendant responded that he rode ahead and when he looked back he saw the victim picking something off the ground. He heard the victim say that they had robbed him of ten dollars. Defendant said that the gun was given to him later by the co-defendant, who asked him to hold it when they stopped and got candy from the Candy Lady at a house near the park.
In the third statement, the detective asked the defendant again what he did during the robbery. Defendant said, “[S]ir, I didn’t do anything.” He said he could see something going on between the buildings, and when the two co-defendants came up to him on their bikes, he followed behind them. The defendant denied knowing what was going on or having any role in the robbery. Eventually, after the detective kept insisting that he was a lookout and involved in the robbery, the defendant told the detective he could consider him a lookout if that was what he wanted to call it. At trial, however, the detective conceded that the defendant did not confess to being a lookout and that he maintained his innocence throughout the three statements.
After the state rested, the defense moved for a judgment of acquittal. In denying the motion, the trial court re-fei’red to the victim’s testimony that he believed the defendant was acting as a lookout because he was standing on the bridge about a block away, well within a distance to be able to see what occurred, and that he felt that all three people were involved.
The defendant took the stand and testified. He said that on the date of the incident, he was at his cousin’s house and met up with Miller and Hubbard. They were going to play basketball at Coleman Park. All three of them were riding bikes. The defendant said he kept riding to the gas station, but Miller and Hubbard just turned off with no explanation. He saw Carter going toward the buildings. The defendant said he was about a car-length in front of his friends. He did not hear them say anything. He rode past Carter, looked back, and saw no one was behind him. He saw the others when he got over the bridge. Then he saw Miller and Hubbard riding towards him, and Carter picking something up. It was not until he saw Carter picking something up that he saw Carter; he did not see Carter with his hands raised. The defendant heard Carter say, “you all just going to take my ten dollars like that?” According to the defendant, the bridge where he stood was about a block away from the buildings.
After the co-defendants joined him, they rode over to the Candy Lady, who sold candy out of her house. He said the “jit,” “[t]he little kid,” meaning Miller, was going through his pockets pulling out money to pay the Candy Lady, and he told the defendant to hold the gun so he could eat his stuff. The defendant did not know what happened, but thought it was suspicious. He said he had known Miller for only two days, and he took the gun because he “wasn’t thinking at the point in time.” They went to Coleman Park, where the police arrested them. They searched the defendant and found the gun *578 in his pocket. Neither Miller nor Hubbard said anything to him beforehand about doing anything illegal. He did not hear either of them tell Carter to pull over or he would be shot.
The defendant acknowledged that he waived his rights at the police department and admitted to the officer that he had a concealed weapon on him. However, he consistently denied being involved in the robbery, and only after the detective kept saying he was the lookout did he, in exasperation, tell the officer he could consider him a lookout “if that’s what you want to call it.”
The defendant rested and renewed his motion for judgment of acquittal. He argued that there was no evidence that he had the conscious intent that a criminal act be committed or that he did something to incite, encourage, assist, or advise in the crime. The court denied the motion.
The jury found the defendant guilty of robbery with a firearm. It answered “No” to the special interrogatory whether he actually possessed a firearm. The jury also found the defendant guilty of carrying a concealed firearm. He was sentenced to ten years on the robbery count and five years on the concealed firearm charge.
“In ruling on a motion for judgment of acquittal, it ‘is the trial judge’s proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state.’ ” Hill v. State, 958 So.2d 549, 551 (Fla. 4th DCA 2007) (citations omitted). An appellate court reviews the denial of a motion for judgment of acquittal de novo, because the issue is purely a question of law, and it is in an equal position with a trial court to determine from the record the legal sufficiency of the evidence. Pagan v. State, 830 So.2d 792, 803 (Fla.2002); Smith v. State, 949 So.2d 253, 254-55 (Fla. 4th DCA 2007).
The defendant argues that the trial court erroneously denied his motion for judgment of acquittal because the evidence was legally insufficient to show that he was a principal to the robbery.[1] “ ‘In order to be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime.’ ” Hill, 958 So.2d at 551 (quoting Staten v. State, 519 So.2d 622, 624 (Fla.1988)). Mere knowledge that an offense is being committed, mere presence at the scene, and even a display of questionable behavior after the fact, are not, alone, sufficient to establish participation. Id.
Here, the defendant’s intent to participate in the robbery before or during its commission was not sufficiently established. His actions consisted of riding his bicycle away from his two companions, who committed the robbery, looking back and waiting for them about a block away on a bridge, and later taking possession of the firearm that was used in the robbery. The fact that the defendant was in a position to look back and see the victim being *579 robbed is insufficient to prove his intent to participate. No evidence was presented that he was aware his companions were planning to commit the robbery or that he did or said anything to encourage, aid, or assist them in committing the robbery. Further, the facts did not disprove or rebut the defendant’s explanation that he first came into possession of the gun when he unwittingly took it from one of the co-defendants when asked to do so. No competent substantial evidence refuted his denials of participation in the robbery and the reasonable possibility that he was merely a bystander who did nothing to assist, encourage, or aid in commission of the robbery. See State v. Law, 559 So.2d 187, 189 (Fla.1989).
The state argues that a jury could infer that the defendant was a principal based upon the testimony of the victim that he believed the defendant was a lookout for the two men who robbed him. However, the victim testified that the defendant did not actually do or say anything to indicate that he was a participant. He believed the defendant was involved because he rode his bicycle with the co-defendants before and after the robbery and he could .observe the robbery from the bridge a block away.
Relying on Hill, the state urges us to affirm the defendant’s robbery conviction. That case, however, is factually distinguishable. In Hill, the victim was robbed while on a bicycle. 958 So.2d at 550. He identified Hill’s cousin as the man who stole his money at gunpoint and Hill as the driver of the getaway car. Id. Shortly after the robbery, Hill, while driving the car, fled from the police in a high speed chase. Eventually the car was forced to stop at a dead end and a fence. The defendant exited the vehicle with his hands raised but then took off running through a gap in the fence. Id. Hill admitted that he was the driver of the car on the night of the robbery and that he watched his cousin rob the victim. Id. He claimed that he did not know what his cousin was going to do and did nothing to participate in the robbery. Id. at 550-51. We affirmed Hill’s robbery conviction, concluding that there was substantial evidence inconsistent with innocence and indicative of guilt. Id. at 552. In addition to Hill’s actions in watching his cousin rob the victim, waiting for him to get back in his car, and driving him away with the fruits of the crime and the gun, Hill fled from the police in a high-speed chase. Id. at 551-52. We stated that whether Hill’s flight was evidence of his intent to participate in the crime was a proper question for the jury. Id. at 552. Unlike Hill, in this case the defendant was not a getaway driver, nor did he flee from the police.
We find J.H. v. State, 370 So.2d 1219 (Fla. 3d DCA 1979), to be more closely on point than Hill. In J.H., the victim was sitting on a bus bench when she was approached by two males. The perpetrator sat next to the victim, while the defendant stood behind the bench. The perpetrator grabbed the victim’s purse. The defendant took no part in the actual robbery and did not talk to the perpetrator. After the perpetrator took the purse, the defendant ran away with him. When apprehended, the defendant denied that he had done anything wrong. On those facts, the Third District held that the evidence that the defendant was present at the scene of the crime and fled it after it had been committed was “manifestly insufficient to exclude a reasonable hypothesis of innocence.” Id. at 1220. The court explained that the evidence “does not exclude the reasonable inference that the defendant had no knowledge of the crime until it actually occurred, and thus that he did not intend to assist in its commission.” Id.
*580 Like in J.H., we find the evidence to be manifestly insufficient to exclude the reasonable inference that the defendant had no knowledge of the crime until it actually occurred, and did not intend to assist in its commission. The defendant in the present case rode his bicycle past the victim while the other two men stopped the victim, forced him behind a building and robbed him. The defendant did not stop with the other two men, but instead rode a block away to a bridge, where, according to the victim, he stood and looked back. Merely observing or looking on as a crime is committed, without more, does not equate to acting as a lookout. Moreover, the victim’s subjective belief that the defendant was acting as a lookout was based on nothing more than the defendant’s mere presence at the scene.
Relying upon the victim’s virtually incomprehensible statement about the defendant “making motions where everybody get surrounded,” the dissent attempts to distinguish J.H. on the basis that in J.H. there was no evidence of the defendant attempting to curtail the victim’s ability to escape. We disagree, however, with the dissent’s suggestion that there was an adequate evidentiary basis to conclude that the defendant curtailed the victim’s ability to escape in this case. The victim ultimately admitted that the defendant did not actually say anything or do anything other than watch the robbery from the bridge. There was no evidence of anyone surrounding the victim other than the co-defendants, whom the defendant did not communicate with during the robbery, according to the victim’s own testimony.
Nor does the defendant’s conduct in continuing to ride his bike with the co-defendants to the park after the robbery and later taking possession of the firearm prove intent to commit the robbery either before or during its commission. Notably, there was no evidence that the defendant ever took possession of any of the money obtained in the robbery. We conclude that the defendant’s motion for judgment of acquittal should have been granted because the evidence was legally insufficient to establish that the defendant aided and abetted the co-defendants in the robbery and was a principal to robbery.
The defendant also argues that the trial court erred in overruling his objection to the detective’s testimony that he determined, after talking to non-testifying co-defendants during his investigation, that defendant was a lookout. We agree with defendant that this was prejudicial error which would require a new trial on the robbery charge. However, because we are reversing and remanding to discharge the defendant on the robbery conviction, we see no need to fully address this point on appeal.
Reversed and Remanded with directions to discharge the defendant’s robbery with a firearm conviction.
PEGG, ROBERT L., Associate Judge, concurs.
GERBER, J., concurs in part and dissents in part with opinion.

. Because it was uncontested that the defendant did not commit the actual robbery, he was charged based on the principal theory under section 777.011, Florida Statutes (2009). See § 777.011, Fla. Stat. (2009) ("Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.”).