559 So.2d 187 (1989)
STATE of Florida, Petitioner,
v.
Ronnie S. LAW, Respondent.
No. 69976.
Supreme Court of Florida.
July 27, 1989.
Rehearing Denied April 16, 1990.
Robert A. Butterworth, Atty. Gen., and Maria Ines Suber, Gregory G. Costas, Bradford L. Thomas, Asst. Attys. Gen., and Richard E. Doran, Asst. Atty. Gen., Acting Director, Crim. Div., Tallahassee, for petitioner.
Arthur A. Shimek of Shimek and Associates, P.A., Pensacola, for respondent.
EHRLICH, Chief Justice.
We have for review a decision of the First District Court of Appeal, Law v. State, 502 So.2d 471 (Fla. 1st DCA 1987), because of apparent conflict with Lynch v. *188 State, 293 So.2d 44 (Fla. 1974). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
The question presented is whether a trial judge may send a criminal case to the jury if all of the state's evidence is circumstantial in nature and the state has failed to present competent evidence sufficient to enable the jury to exclude every reasonable hypothesis of innocence. Stated another way, does the common law circumstantial evidence rule apply when a trial judge rules on a motion for judgment of acquittal? We agree with the district court that the rule applies, but disagree that applying the rule to the facts of the instant case required the trial judge to grant Law's motion for judgment of acquittal.
The law as it has been applied by this Court in reviewing circumstantial evidence cases is clear.[1] A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. Jaramillo v. State, 417 So.2d 257 (Fla. 1984). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972 (Fla. 1977); Mayo v. State, 71 So.2d 899 (Fla. 1954). The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse. Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); Rose v. State, 425 So.2d 521 (Fla. 1982), cert. denied, 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983), disapproved on other grounds, Williams v. State, 488 So.2d 62 (Fla. 1986).
The state contends that applying this rule when considering a defendant's motion for judgment of acquittal would run afoul of previous statements from this Court regarding the standard of review applicable to such motions. The state argues that the standard applied by the district court in Fowler v. State, 492 So.2d 1344 (Fla. 1st DCA 1986), review denied, 503 So.2d 328 (Fla. 1987), upon which its Law opinion is founded, conflicts with this Court's holding in Lynch.[2] The state contends that because a defendant, in moving for a judgment of acquittal, admits not only the facts as adduced at trial, but also every conclusion which is favorable to the state which may be reasonably inferred from the evidence, the trial court should not be required to grant a judgment of acquittal simply because the state has failed to present evidence which is inconsistent with the defendant's reasonable hypotheses of innocence.
Upon careful consideration, we find that the view expressed in Lynch and that expressed by the district court below in the instant case and in Fowler are harmonious. A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See Wilson v. State, 493 So.2d 1019, 1022 (Fla. 1986). Consistent with the standard *189 set forth in Lynch, if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law." 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla.R.Crim.P. 3.380.
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. Spinkellink v. State, 313 So.2d 666, 670 (Fla. 1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976). The state is not required to "rebut conclusively every possible variation"[3] of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. See Toole v. State, 472 So.2d 1174, 1176 (Fla. 1985). Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
If the rule were not applied in this manner, a trial judge would be required to send a case to the jury even where no evidence contradicting the defendant's theory of innocence was present, only for a verdict of guilty to be reversed on direct appeal. We agree with the Fowler court that
it is for the court to determine, as a threshold matter, whether the state has been able to produce competent, substantial evidence to contradict the defendant's story. If the state fails in this initial burden, then it is the court's duty to grant a judgment of acquittal to the defendant as to the charged offense, as well as any lesser-included offenses not supported by the evidence... . Otherwise, there would be no function or role for the courts in reviewing circumstantial evidence, as was stated so well in Davis v. State, 436 So.2d 196 (Fla. 4th DCA 1983), 200: "If we were to follow the state's logic, a trial judge could never ... grant a motion for judgment of acquittal pursuant to Florida Rule of Criminal Procedure 3.380 when the evidence [is] circumstantial. Instead, every case would have to go to the jury."
Fowler, 492 So.2d at 1347.
We now turn to the case at bar. This is a tragic case, which deserved, and has received, many hours of careful judicial consideration. The relevant facts are that respondent Ronnie S. Law was charged by indictment with first-degree murder caused during aggravated child abuse in the death of his girlfriend's three-year-old son, Louis James Dees IV, known as "Little Jim." Little Jim was found dead in his bed on the morning of February 10, 1985. The cause of death was established to be a subdural hematoma caused by blunt trauma to the head.
At trial, Law raised several hypotheses of innocence, including that Little Jim's mother, Carol Free, may have inflicted the fatal blow; that Little Jim's, then eight-year-old, brother, Robert, may have caused the fatal injury while "roughhousing" with his brother; that the fatal injury, along with other injuries to the child's body, were caused by a series of accidental falls during the forty-eight-hour period prior to the boy's death; and that Law may have accidentally inflicted the fatal injury while playing with Little Jim. At the close of the state's case, and again at the close of all the evidence, the defense sought a judgment of acquittal, arguing the state had failed to contradict Law's hypotheses of innocence. Those motions were denied, and the jury returned a guilty verdict on the lesser included offense of second-degree murder. Law was sentenced within the guidelines range to seventeen years in state prison.
On appeal, the district court found the state had failed to meet its burden of contradicting each of Law's hypotheses of innocence, and held as a matter of law the trial judge erred in sending the case to the *190 jury. The state sought review by this Court.
In reversing the conviction, the district court failed to delineate which of Law's theories of innocence remained in its view viable, stating: "Without detailing the lengthy evidence presented at trial, we find that the evidence left room for several inferences of fact, at least one of which was consistent with appellant's hypotheses of innocence." 502 So.2d at 473. In the absence of such direction from the district court, we are required to consider each of Law's hypotheses.

1. The victim's mother may have delivered the fatal blow.
This theory which rests on Law's assertion that Carol Free was the last one to check on Little Jim, who was suffering from sinus congestion, the night he died was refuted by evidence that the fatal blow likely had been delivered well before Free entered the room to check on the child's breathing. Little Jim's brother Robert testified he was in the bedroom when his mother checked on Little Jim, but did not report a spanking or beating. Law also did not report hearing Little Jim cry out in an unusual manner. Moreover, Robert's testimony supported the inference that Law had delivered the fatal blow before the children went to bed. Robert testified that he saw Law hitting Little Jim through an open bedroom door, and that upon noticing he was being observed by Robert, Law closed the door to complete the physical reprimand without being seen. Free was asleep in another room at that time. When Robert went to bed a short time later, he testified, Little Jim was lying not on his side, as was his custom, but on his back  the position in which his body was discovered the next morning  and his lips were discolored. This evidence was sufficiently contrary to Law's theory that Free delivered the fatal blow to allow the jury to consider this contention.

2. The older brother may have caused the fatal injury while "roughhousing" with Little Jim.
Dr. Ronald L. Reeves, an eminently qualified pathologist with substantial experience recognizing child injuries and child abuse, and Dr. Everett Havard, an equally qualified forensic pathologist, gave testimony refuting Law's theory that the subdural hematoma which caused Little Jim's death could have been inflicted during rough playing between Little Jim and Robert. The defense raised the possibility that the fatal blow may have come when Robert knocked the younger boy off his feet, causing Little Jim's head to strike a barbell. Dr. Reeves testified that not only would the wound caused by such a fall be significantly different from those found on the body of Little Jim, but there would be insufficient force behind such a blow to cause the fatal injury. The doctor testified that
[i]t's very unusual ... and rare for a child to sustain any type of injury falling ... we're talking about a child who is only 36 inches high . .. [s]o the maximum fall is a tumble; it's just falling, and even if it accelerated the type of impact that you get, [falling] even against an object would not give us significant injury... . So no, I don't think that's a plausible explanation.
Both doctors testified that in their opinion the death was a homicide. Dr. Reeves testified it was his professional opinion that the death was the result of "a brutal beating." This and other testimony of the pathologists clearly contradicts the hypothesis that the fatal injury could have been caused by "roughhousing" between the children.

3. The fatal injury, along with other injuries present on Little Jim's body, could have been caused by a series of accidental falls.
On this point, also, Dr. Reeves' testimony was sufficient to raise a jury question. The defense raised the possibility that the subdural hematoma and other injuries might have been caused by Little Jim falling off a bunkbed or tumbling down dunes during an afternoon trip to the beach. Dr. Reeves reviewed in detail the pattern of *191 marks and bruises on the body, described the type of blow which would cause the fatal injury, and concluded that
studies have indicated and shown and personal experience has shown children falling don't sustain significant injuries ... [If] a child running 20 miles an hour through the room trips and falls head first on a pointed edge of something, yes, he could sustain an injury that could be significant, but it would cause a laceration and possibly a skull fracture, and other things we don't see [on the body of Little Jim]. It wouldn't give this diffuse pattern of injury. So I don't think that's plausible.
This testimony was sufficiently at odds with Law's theory to send the question to the jury.

4. Law may have accidentally inflicted the fatal injury while playing with Little Jim.
Defense counsel raised the possibility that Law may have accidentally caused the boy's head injury while the two were playing on the night of Little Jim's death; that in swinging the child playfully around the bedroom, he may have inadvertently caused the boy's head to hit the floor or the bunkbed. The record reflects, however, that Law himself did not believe this to be the case. Responding to an inquiry from defense counsel, Law testified
I didn't swing him hard. I was doing it slowly, and I got back around here, I was going to sit him back down. I don't know if he just didn't get his footing or if I slipped, my hand slipped, and then he fell, and he hit the floor. But when he come around, he was still far enough away, he put his hands out and caught himself, and I didn't hear him hit the bed or nothing. But I thought maybe he might have or something. So I checked him, but I couldn't really see no signs or anything.
The testimony of Dr. Reeves also was sufficient on this point to raise a question for the jury. He testified that there were few parts of the bunkbed which were of the right shape to cause the head injury found on the boy's body. He further testified that
you would also have to assume that [Little Jim's head] just happened to hit one of those few small areas that happen to be flat, which is very unlikely to have happened. Then considering and putting into connotation with the distribution on the head, the fact that you get an area on the back of the head, that means the child has gone backwards ... you read some study on skull fractures in children, you find they don't have any... . [T]he only time you see skull fractures of the occipital bones in some studies is by inflicted trauma; it doesn't occur accidentally.
Other testimony by Dr. Reeves further contradicted Law's theories, leaving no doubt that the trial judge properly allowed the case to go to the jury:
Q: You stated ... that there is no conceivable way that these injuries could have been sustained accidentally. Is that still your opinion, sir?
A: Absolutely.
Q: And upon what do you base that, briefly?
A: Briefly, on the fact that considering every possible explanation, every conceivable cause that I can think of, including everything that's been proposed as an explanation as to why the injuries are here in the distribution pattern and quantity and location that we have them, there is, in my opinion, absolutely no explanation that would explain this, other than intentionally inflicted trauma on this child.

Q: [Y]ou stated that the photographs of the bruises on the deceased body are not consistent with the spanking, but with a brutal beating. Is that still your conclusion, sir?
A: Yes, it is.
.....
Q: If all of these things had happened to the child that very weekend, falling off the bunkbed, falling on the barbells, hitting the coffee table, getting hit by a bike, wrestling in bed, being swung around and hitting the bed, would any of *192 those things have caused his death, in your opinion, in this case?
A: For the same reasons I've said before, unless there are extraordinary circumstances that involved each and every one of those, which would mean excessive force, which is very unlikely if not impossible to have happened without some intervening factor, no, that would not have accounted for the injuries because there are too many injuries too diffuse and too diverse to, in fact, be accounted for by just a few isolated injuries. And again, you are taking it out of context when you examine something like this and you see multiple injuries, diffusely, to try to explain one here and one there is sort of absurd. Kids don't sustain multiple serious injuries, especially when they are isolated in various portions of the body, accidentally all the time. I think that would be totally incredible, and the odds against that would be significant.

(Emphasis added.)
Because we find that it is clear from the record that the state introduced competent evidence from which the jury could have reasonably rejected each of Law's theories, the result reached by the district court cannot stand. Accordingly, the opinion of the district court is approved in part, quashed in part, and the cause is remanded for further proceedings consistent with this opinion.
It is so ordered.
OVERTON, McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] For a comprehensive review of the rule as it has been applied in Florida see Jones v. State, 466 So.2d 301 (Fla.3d DCA 1985), approved, 485 So.2d 1283 (Fla. 1986).
[2] In Lynch v. State, 293 So.2d 44, 45 (Fla. 1974), we said:

A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence. The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. Where there is room for a difference of opinion between reasonable men as to the proof of facts from which the ultimate fact is sought to be established, or where there is room for such differences as to the inference which might be drawn from conceded facts, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge. The credibility and probative force of conflicting testimony should not be determined on a motion for judgment of acquittal.
[3] State v. Allen, 335 So.2d 823, 826 (Fla. 1976).