74 So.3d 572 (2011)
Emerson J. PINKNEY, Appellant,
v.
STATE of Florida, Appellee.
No. 2D07-6022.
District Court of Appeal of Florida, Second District.
November 18, 2011.
*573 James Marion Moorman, Public Defender, and Frederick W. Vollrath, Special Assistant Public Defender, Bartow, for Appellant.
Pamela Jo Bondi, Attorney General, Tallahassee, and Helene S. Parnes, Assistant Attorney General, Tampa, for Appellee.
EN BANC
KELLY, Judge.
Emerson J. Pinkney was charged with and convicted of aggravated assault on a law enforcement officer, resisting or obstructing an officer without violence, and fleeing or eluding a law enforcement officer at a high speed or with wanton disregard for the safety of persons or property. He appeals only his judgment and sentence for aggravated assault on a law enforcement officer. He challenges the denial of his motion for judgment of acquittal. Because the State produced sufficient evidence to permit a jury to find that Mr. Pinkney intentionally drove his car in a manner that put the officer in fear of imminent harm, we affirm. We write, however, to clarify the law on assault and to recede from our previous decision in State v. Shorette, 404 So.2d 816 (Fla. 2d DCA 1981), on which Mr. Pinkney relies.
The record shows that Mr. Pinkney's encounter with the police began around eleven o'clock in the morning when two officers sighted a parked Chevy Malibu that they believed matched the description of an automobile that was the subject of a BOLO. Officer Zammitt, the officer Mr. Pinkney was charged with assaulting, described his initial encounter with Mr. Pinkney as follows:
Q. Did you attempt to make contact with the passengers of the vehicle?
A. It was one black male in a red shirt and black pants who was getting into the passenger side of the vehicle when I ordered him down at gunpoint.
Q. Could you see how many other people where [sic] in the vehicle?
A. Yes, ma'am.
Q. And how many were there?
A. One.
Q. What happened when the passenger exited the vehicle; what happened after he left the vehicle?
A. I ordered him down on the ground. He began to get down on the ground when the reverse lights came on the Chevy Malibu.
Q. The reverse lights came on?
A. Yes, ma'am.
Q. And how far away were [you] from the car when the reverse lights came on?
A. Approximately five to ten feet.

*574 Q. What happened after the reverse lights of the Malibu came on?
A. He began to back up at a high rate of speed.
Q. Where were you located in relation to the vehicle when it began to back up?
A. I was standing not directly behind the vehicle. I was [off] to the right-hand side, and I was still holding the passenger at gunpoint. At that point the vehicle backed up and went directly right at me.
Q. Did you have to take any action to avoid being hit by the vehicle?
A. Yes, ma'am. Actually, I wouldn't say jump out of the way, I had to get out of the way in a hurry to avoid being struck.
Q. Did you feel like you were going to be struck by that car?
A. If I did not move, yes, absolutely.
Q. Were you afraid that that car was going to hit you?
A. Yes, ma'am.
Q. And you stated that when it began backing up, it went directly towards you?
A. Yes.
On cross-examination, the defense elicited the following testimony:
Q. You stated initially after you had gotten the passenger down on the ground, you and your partner . . . saw the reverse lights come on. Where were you in relation to the vehicle?
A. I was off behind the vehicle up off to the right-hand side with the passenger getting his hands on the ground when [his] lights came on.
Q. Okay. And you said it started[] coming back at very quick speed?
A. Yes, ma'am.
Q. But you had time to get out of the way?
A. Yes, ma'am.
Q. Quickly?
A. Yes, ma'am.
Q. How close did it come to you?
A. Very close.
Q. How close?
A. At the time it came very close. That is why I felt for my safety. I had to jump out of the way.
Officer Knick, who accompanied Officer Zammitt, testified that while this was occurring he was approaching the driver's side of the car. He stated that he was seven to eight feet from the rear of the car and that Officer Zammitt was "much closer"five to six feetwhen the "vehicle went into reverse and started to speed backwards" toward Officer Zammitt. The driver then began going forward, eventually striking the front bumper of a second police car that had arrived at the gas station. As the car was moving forward toward the second police car, Officer Zammitt and Officer Knick ran up to the car and unsuccessfully attempted to open the doors. Each one then used his baton to smash out the windows on the driver and passenger sides of the car. Officer Zammitt testified that at this point he pulled out his gun and commanded the driver to stop; however, the driver continued out of the gas station parking lot. The ensuing high speed chase ended when the car crashed into a ditch. The driver then ran from the car, entered a nearby apartment, jumped out a back window, and fled into the woods. The police were not able to locate him that day, but they did collect blood samples from the car and the apartment that were later identified as belonging to Mr. Pinkney.
At his trial, Mr. Pinkney moved for a judgment of acquittal on the aggravated assault charge arguing that the State had not proved he had the specific intent to do *575 violence to the victim. The trial court denied Mr. Pinkney's motion. On appeal, Mr. Pinkney contends this was error because the State did not prove he had the specific intent to do violence to the victim, which he argues is an element of the crime of assault. Although Mr. Pinkney's argument correctly reflects our holding in Shorette, it is not an accurate statement of the law.
In Shorette, the defendant, who admitted drinking intoxicants, was driving a car in excess of the speed limit. 404 So.2d at 817. He failed to negotiate a curve in the road and struck an oncoming automobile, injuring the two occupants of the other vehicle. He was charged with two counts of aggravated assault, which he moved to dismiss, arguing that the State had failed to show that he had the intent necessary to prove the offense. The trial court granted the motion, and the State appealed. Id. This court affirmed and held that to obtain a conviction the State had to prove that the defendant had the intent to do violence to the victims. Id. However, this was a misstatement of the law.[1]
Section 784.011(1), Florida Statutes (2006), defines assault as follows: "An `assault' is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent."[2] In reaching the conclusion that section 784.011 required the State to prove that the defendant had the intent to do violence, Shorette relied on Russell v. State, 373 So.2d 97, 98 (Fla. 2d DCA 1979). 404 So.2d at 817. Russell held that because the battery statute provided that an individual had committed a battery if he "intentionally" struck or touched another person against the victim's will or "intentionally" caused bodily harm to another, the State was required to prove the defendant had the "intent to" touch, strike, or cause bodily harm to the victim. 373 So.2d at 98. However, in Linehan v. *576 State, 442 So.2d 244, 247 (Fla. 2d DCA 1983) (en banc), approved in result only, 476 So.2d 1262 (Fla.1985), this court receded from Russell, explaining that words such as "willfully" or "intentionally," without more, indicate the statute "is one that prohibits either a specific voluntary act or something that is substantially certain to result from the act" and they serve to distinguish the act from one done accidentally or negligently.
Thus, for example, where a defendant threw a lighter at the floor and it ricocheted and hit the victim's ankle, to establish that the defendant intentionally struck the victim, and thus was guilty of battery, the State did not have to prove the defendant intended to strike the victim. C.B. v. State, 810 So.2d 1072 (Fla. 4th DCA 2002). It was sufficient if the State established that the defendant threw the lighter in such a way that it was substantially certain it would hit the victim's ankle. Id. at 1073. Because the evidence established that the defendant threw the lighter at the floor and that it only hit the teacher "because of a crazy bounce," the evidence was insufficient to sustain a conviction for battery. Id.
Similarly, the defendant in S.D. v. State, 882 So.2d 447 (Fla. 4th DCA 2004), asserted that the State failed to prove she intentionally hit her mother. The evidence showed that the defendant was angry and was flailing her arms around. She had just finished fighting with her brother and had slapped her sister before hitting her mother. The mother testified that the defendant saw her coming near and continued swinging her arms. Because the description of the manner in which the defendant was swinging her arms made it substantially certain that the mother would be hit, the court concluded the evidence was sufficient to establish battery. Id. at 449. In so holding, the court explained that "[i]t is this substantial certainty of a touching or striking that satisfies the intent element of battery." Id.
Likewise, in Reynolds v. State, 784 So.2d 509, 511 (Fla. 1st DCA 2001), the court acknowledged that a statute making it a crime to intentionally commit an act against any animal that results in the cruel death or excessive or repeated infliction of unnecessary pain did not require that the State prove that the defendant acted intending to cause a cruel death or excessive or repeated infliction of unnecessary pain. Instead, the State only had to prove that the defendant committed an act that was substantially certain to result in cruel death or excessive or repeated infliction of unnecessary pain. See id. (explaining the statute is one "that prohibits either a specific voluntary act or something that is substantially certain to result from the act") (quoting Linehan, 442 So.2d at 247)).
Section 784.011(1) requires proof of an intentional threat that creates a fear of imminent violence. Thus, to satisfy the intent element the State must prove that the defendant did an act that was substantially certain to put the victim in fear of imminent violence, not that the defendant had the intent to do violence to the victim. As we explained when we receded from Russell, when a "statute is one that prohibits either a specific voluntary act or something that is substantially certain to result from the act . . ., [a] person's subjective intent to cause the particular result is irrelevant . . . because the law ascribes to him a presumption that he intended such a result." Linehan, 442 So.2d at 247.
Having clarified the elements of the crime of assault, we turn to the question of whether the evidence in this case was sufficient to withstand a motion for a judgment of acquittal. We apply a de novo standard when reviewing a motion *577 for judgment of acquittal. Pagan v. State, 830 So.2d 792, 803 (Fla.2002).
Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.
Id. (citations omitted). It is undisputed that Mr. Pinkney's act of backing his car in the direction of Officer Zammitt constituted a threat of violence. Given the proximity of the car to the officer, it was substantially certain that the threat would put Officer Zammitt in fear of imminent violence, and he testified that he was in fact fearful he would be hit by the car. Nevertheless, in addition to citing Shorette, Mr. Pinkney cites Swift v. State, 973 So.2d 1196 (Fla. 2d DCA 2008), in support of his argument that he was entitled to a judgment of acquittal.
Mr. Swift was charged with aggravated assault after he backed his SUV toward a police officer who had run behind the SUV seconds before Mr. Swift began backing up. This court reversed Mr. Swift's conviction for aggravated assault on a law enforcement officer after concluding that the State had been "unable to establish that Mr. Swift knew that Officer Sweat had run behind the SUV during the minimal amount of time that elapsed after Mr. Swift pulled forward and before he began to back up a second time." Id. at 1199.[3] We find Swift distinguishable in two respects.
First, the facts in this case are distinguishable. In describing the evidence in Swift, this court explained:
The circumstances surrounding Mr. Swift's departure from the driveway require closer examination because they form the basis for the aggravated assault charge. Officer Sweat had parked his police cruiser on the driver's side of the SUV and slightly to its rear. Sergeant Green had parked on the SUV's passenger side. Thus the SUV was partially blocked in the driveway. When the officers approached the vehicle's passenger side and began to shout commands, Mr. Swift initially backed up and then pulled forward. This maneuver was apparently necessary for Mr. Swift to position the SUV so that he could back it out of the driveway without striking Officer Sweat's police cruiser.
After the SUV began to move, both officers drew their handguns. At this point, Officer Sweat was still standing at the rear door on the vehicle's passenger side. When Mr. Swift pulled forward after initially backing up, Officer Sweat ran behind the SUV. Then, as Mr. Swift began backing up again, Officer Sweat had to step out of the way of the oncoming vehicle to avoid being hit. While Officer Sweat was getting out of the way, Mr. Swift successfully cleared the officer's police cruiser and backed into the street. At this point, Mr. Swift drove away from the scene.
Officer Sweat and Sergeant Green were the only State witnesses to testify concerning the events that formed the basis for the aggravated assault charge *578 against Mr. Swift. Sergeant Green candidly admitted that when he and Officer Sweat approached the SUV's passenger side, the entire encounter with Mr. Swift lasted less than thirty seconds. During most of this brief encounter, Officer Sweat had been standing at the SUV's rear door. After Officer Sweat left his position of relative safety to run behind the SUV when it pulled forward, he could not have been behind the vehicle for more than a few seconds before he was forced to step out of the SUV's path as it backed up a second time. Under these circumstances, it is not surprising that neither officer could establish that Mr. Swift knew that Officer Sweat had left his position at the SUV's side and run to its rear.
Id. at 1198. Additionally, this court noted that the encounter occurred at 8:30 in the evening, that the windows on the SUV were tinted, and that the tinting was dark enough to obscure the officers' view of the passenger in the rear seat. Id. at 1197-98.
Here, rather than suddenly running behind the car, the officer was in the same location relative to the car throughout the encounter. It was daylight and the officer indicated he could see inside the car. The passenger door was open when Officer Zammitt began shouting commands, which the passenger began to obey. Simultaneously, the "reverse lights" on the car illuminated, and the car began to back up in Officer Zammitt's direction at a high rate of speed. Given all these circumstances, we conclude that a jury could reasonably find that Mr. Pinkney knew Officer Zammitt was behind his car and that Mr. Pinkney was attempting to escape the same fate as his passenger by throwing the car in reverse and leaving the scene as quickly as possible.
Second, unlike the defendant in Swift, the focus of Mr. Pinkney's argument has been his lack of intent to harm the officer, not a claim that he was unaware that the officer was behind his car. The dissent erroneously states that Mr. Pinkney's hypothesis of innocence was that he did not see Officer Zammitt. At trial, Mr. Pinkney argued generally that this was a case of mistaken identity. Specifically with respect to the assault charge, Mr. Pinkney argued that the State's evidence did not prove he intended to hit the officer, just that he was trying to leave and was frightened because the officer had his gun drawn:
That vehicle accelerated back, as he said, at such a high speed, it would have hit. He wouldn't have been able to get out to the way. The vehicle, the driver of that vehicle, had no intention of hitting the officer. The driver of that vehicle was a juvenile. The driver of that vehicle was scared. That officer has a gun drawn on the other man that was in that vehicle. It was that instinctual thing that we all have as human beings, especially young children have, 16-year-old children in spite of flight. [sic]
So the officer is testifying he came at him with intent. That's not what happened. If there was intent to hit that officer, that officer would have [been] hit [at] such a short distance.

On appeal, he has argued that just because he had to reverse his vehicle in order to exit the gas station parking lot, it did not mean he had "the specific intent to do violence" to the person of Officer Zammitt. In his brief, he concedes that he attempted to leave because he did not want to be apprehended. However, Mr. Pinkney's motive for reversing and backing up toward Officer Zammitt is immaterial.[4]
*579 The trial court correctly denied Mr. Pinkney's motion for judgment of acquittal and submitted the case to the jury. Accordingly, we affirm Mr. Pinkney's judgment and sentence for aggravated assault with a deadly weapon on a law enforcement officer. We recede from Shorette and all similar cases to the extent they are based on the erroneous language in Shorette.
Affirmed.
ALTENBERND, WHATLEY, CASANUEVA, LaROSE, KHOUZAM, CRENSHAW, MORRIS, and BLACK, JJ., Concur.
VILLANTI, J., Concurs specially with opinion.
DAVIS, J., Dissents with opinion, in which SILBERMAN, C.J., and NORTHCUTT and WALLACE, JJ., Concur.
VILLANTI, J., Concurring specially.
I concur in that portion of both the majority and dissenting opinions that recedes from our prior decision in State v. Shorette, 404 So.2d 816 (Fla. 2d DCA 1981). I take no position on the remainder of the issues raised, believing them best left to the assigned panel.
DAVIS, Judge, Dissenting.
Because the State did not establish that Mr. Pinkney intentionally and unlawfully threatened to do violence to Officer Zammitt, I would reverse. The evidence simply did not show that Mr. Pinkney knew or likely knew that Officer Zammitt was standing in his direction of travel. But I do agree with the majority to the extent that it recedes from Shorette, 404 So.2d at 817, based on that case's misstatement of law that section 784.011(1) "requires proof of a specific intent to do violence to the person of another." See generally Cambell v. State, 37 So.3d 948, 950 (Fla. 5th DCA 2010) ("The only intent inherent in the statute[] is the intention to make a threat to do violence.").
Additionally, I recognize that in Swift, 973 So.2d 1196, this court reiterated Shorette's misstatement of the intent requirement of assault. However, as the Fifth District appropriately noted in Cambell, the actual analysis in Swift is legally sound despite any misuse of the Shorette language. The Cambell court noted that
the focus of the appellate court [in Swift] was on whether or not there was evidence that Swift intended to threaten the victim. . . . Since the appellate court concluded that there was no evidence that Mr. Swift knew that the victim was behind his vehicle before he started to back up in the victim's direction, its holding was that the State failed to prove that Mr. Swift intended his act of backing the car to be a threat to do violence to the victim.
37 So.3d at 950. Applying this analysis in the instant case, I conclude that the State's evidence here similarly failed to establish that Mr. Pinkney's act of reversing his vehicle was an intentional, unlawful threat to do violence to Officer Zammitt. Accordingly, I would reverse Mr. Pinkney's judgment and sentence.
While there are differences between the facts in Swift and the instant case, I conclude *580 that a review of the totality of the circumstances in both cases necessarily results in the same conclusion of lawthat the State failed to present prima facie evidence of the elements of an assault.
To obtain a conviction on a charge of aggravated assault, the State must prove the basic elements of an assault as set out in section 784.011. See Benitez v. State, 901 So.2d 935, 937 (Fla. 4th DCA 2005). "An `assault' is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." § 784.011(1). This requires the State to prove three elements: "(1) an intentional, unlawful threat; (2) an apparent ability to carry it out; and (3) creation of a well-founded fear that the violence is imminent." Benitez, 901 So.2d at 937. In this case, it is the intentional threat that I believe the State's evidence fails to sufficiently prove. Based on the record evidence, I disagree with the majority opinion for three reasons.
First, I disagree with the majority's conclusion that the jury could infer from the circumstances that Mr. Pinkney saw Officer Zammitt or otherwise knew he was in the path of the vehicle. The State presented no direct evidence of this fact. There was no testimony that Officer Zammitt engaged Mr. Pinkney in any way prior to the vehicle beginning to move, and there was no evidence establishing that Mr. Pinkney was aware that Officer Zammitt was in the travel path of the vehicle. Although the incident occurred in daylight, the limited evidence of Mr. Pinkney's knowledge was Officer Zammitt's testimony. Officer Zammitt was engaged with the passenger and was to the right side of the vehicle but was able to see a person inside the vehicle. This testimony is purely circumstantial evidence of Mr. Pinkney's knowledge.
Where, as here, the evidence of the defendant's guilt is entirely circumstantial, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. State v. Law, 559 So.2d 187, 188 (Fla. 1989). This is so regardless of how strongly the evidence may suggest the defendant's guilt. Id. To be sure, the question of whether the evidence fails to exclude all reasonable hypotheses of innocence ultimately is for the jury, and a conviction that is supported by substantial, competent evidence will not be reversed. Jackson v. State, 995 So.2d 535, 539 (Fla. 2d DCA 2008) (citing Law, 559 So.2d at 188). But if the State does not offer evidence that is inconsistent with the defendant's hypothesis, "`the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law.'" Law, 559 So.2d at 189 (quoting Lynch v. State, 293 So.2d 44, 45 (Fla.1974)).
Bennett v. State, 46 So.3d 1181, 1183 (Fla. 2d DCA 2010) (alteration in original).
It may be true, as the State argues, that the fact that Officer Zammitt saw someone inside the vehicle could suggest that Mr. Pinkney in turn saw the officer outside the vehicle. However, the totality of the circumstances supports Mr. Pinkney's reasonable hypothesis of innocence that he did not see Officer Zammitt, that he therefore did not intentionally drive his vehicle in the direction of Officer Zammitt in an attempt to threaten the officer, and that instead he intentionally drove the vehicle in reverse in an attempt to flee the scene and escape Officer Knick, who was approaching *581 his driver's side door.[5] There is nothing in the record to suggest that Mr. Pinkney turned his head toward Officer Zammitt or that Officer Zammitt made eye contact with Mr. Pinkney. In fact, Officer Knick, who arrived with Officer Zammitt, testified that while Officer Zammitt dealt with the passenger on the passenger's side of the vehicle, it was Officer Knick who was "making contact with the driver's side." From this testimony, it could be logically inferred that Mr. Pinkney's attention was on Officer Knick and not Officer Zammitt. Even if Mr. Pinkney heard Officer Zammitt giving orders to the passenger who had just exited the vehicle, no evidence established that Mr. Pinkney knew that Officer Zammitt was behind the vehicle or in its path of travel. Indeed, no evidence established that Mr. Pinkney heard Officer Zammitt. Based on the totality of these circumstances, I conclude that from the State's evidence the jury could not infer Mr. Pinkney's knowledge that Officer Zammitt was in the path of travel and that therefore the State did not refute Mr. Pinkney's reasonable hypothesis of innocence.
Second, even if the State's evidence was sufficient to sustain the inference that Mr. Pinkney knew Officer Zammitt was somewhere nearby, I conclude that the State's evidence was insufficient to establish that Mr. Pinkney intended to threaten Officer Zammitt by driving his vehicle in the officer's direction.
A case presenting direct evidence of someone's intent is rare, and as such, it is proper and commonly the case for the State to rely solely on circumstantial evidence to establish intent in the absence of direct evidence. State v. Waters, 436 So.2d 66, 71 (Fla.1983) ("The element of intent, being a state of mind, often can *582 only be proved by circumstantial evidence."). The present case turns on such circumstantial evidence.
I agree with the majority that if the State had shown that Mr. Pinkney intentionally did an act that was "substantially certain" to threaten Officer Zammitt, such would provide sufficient circumstantial proof to allow the jury to infer Mr. Pinkney's intent. Cf. C.B., 810 So.2d at 1073. In C.B., a minor was charged with battery as the result of his throwing a cigarette lighter on the floor and the lighter bouncing up and striking a school official. In determining whether these circumstances supported the intent element of the battery charge, the court determined that the State was required "to prove that the defendant threw the lighter in such a way that it was substantially certain that it would hit the teacher's ankle." Id. at 1073. The court concluded that "[t]he evidence of the defendant's intent was circumstantial. The evidence was insufficient to sustain a conviction[] because it was consistent with the reasonable hypothesis of innocence that the defendant threw the lighter at the floor and hit his teacher only because of a crazy bounce." Id.
Similarly, the only evidence here of Mr. Pinkney's intent consisted of the facts that he drove his car in reverse and that the officer had to move out of the way of the vehicle. However, as I previously stated, that evidence is equally consistent with the reasonable hypothesis that Mr. Pinkney was simply trying to flee the situation. The evidence did not show that Mr. Pinkney knew that Officer Zammitt was inor was substantially certain to be inthe path of travel. Accordingly, I conclude that the evidence is insufficient to show that Mr. Pinkney intended to drive his vehicle in the officer's direction for the purpose of threatening the officer.
Third, I conclude that the State's evidence is also insufficient to sustain a conviction for assault because any inference that Mr. Pinkney intentionally threatened Officer Zammitt by driving at him would have to be based on the inference that Mr. Pinkney knew where Officer Zammitt was located. In other words, under these circumstances, any inference of intent would have to be based on an inference of fact. This is an impermissible stacking of inferences. See Miller v. State, 770 So.2d 1144, 1149 (Fla.2000) ("`Circumstantial evidence is insufficient when it requires pyramiding of assumptions or inferences in order to arrive at the conclusion of guilt.'" (quoting Brown v. State, 672 So.2d 648, 650 (Fla. 4th DCA 1996))).
It is on this third point that I specifically disagree with the majority as to the application of the law to these facts. As the majority correctly concludes, the statute requires "proof of an intentional threat that creates a fear of imminent violence." The majority suggests that the evidence in our record is sufficient to allow a reasonable inference that Mr. Pinkney knew the officer's location when he began to drive the car in reverse. The majority then concludes that based on Mr. Pinkney's knowledge of the officer's location, it can be inferred that Mr. Pinkney's act of driving in that direction is proof of his intent to commit an act that was substantially certain to place the officer in fear of imminent danger. What the majority does not acknowledge, however, is that the evidence that allows the jury to infer an "intentional threat" is circumstantial evidence presented to prove intent, not direct proof of that intent. See C.B., 810 So.2d at 1073. Thus, the majority's analysis calls for the inference of Mr. Pinkney's intent to be impermissibly stacked on the inference of his knowledge of the officer's location.
*583 Accordingly, I disagree with the majority on three grounds. First, the evidence does not support the inference that Mr. Pinkney knew that Officer Zammitt was located in the path of his vehicle. Second, the evidence does not support the inference that Mr. Pinkney intended to threaten the officer by committing an actdriving at himthat was substantially certain to place the officer in fear. And third, the only way for the jury to find the necessary intent to threaten is by impermissibly stacking inferences. For these reasons, I conclude that the trial court erred in denying Mr. Pinkney's motion for judgment of acquittal as to the assault on a law enforcement officer charge, and I would reverse his judgment and sentence on that count.
SILBERMAN, C.J., and NORTHCUTT and WALLACE, JJ., Concur.
NOTES
[1] The crime Shorette describes is essentially an attempt to commit a battery, which is how the common law defined the crime of assault. At common law, an attempt to commit any crime was a misdemeanor, and the misdemeanor was referred to simply as an attempt to commit the particular crime. Rollin M. Perkins, Non-Homicide Offenses Against the Person, 26 B.U. L. Rev. 119, 132-33 (1946). However, the crime of attempted battery had its own name, "assault," because the law of assault developed long before the law of criminal attempts. Id.; see generally 2 Wayne R. LaFave, Substantive Criminal Law, § 11.2 (2d ed. 2003). To constitute the common law crime of assault, the victim did not have to be aware of the attempted battery. Perkins, 26 B.U. L. Rev. at 133; see also McCullers v. State, 206 So.2d 30, 33 (Fla. 4th DCA 1968), disapproved by State v. White, 324 So.2d 630, 631 (Fla. 1975). On the other hand, a civil assault occurred at common law when an unlawful application of force to a person was attempted or threatened if the victim was aware of the attempt and placed in apprehension of an imminent battery. Perkins, 26 B.U. L. Rev. at 132-33. The criminal and the civil common law definitions of assault are still reflected in the various states' statutes defining assault. Some statutes define assault as an attempted battery; others, such as Florida's, define it only as intentional frightening, i.e., civil assault. Most commonly, other states' statutes define it as both. LaFave, § 16.3 at 565.
[2] Before 1975, assault was not statutorily defined. While there is some variation in the wording used in the case law, the elements of the crime of assault, as defined by those cases, mirror the statutory elements. See, e.g., State v. Wilson, 276 So.2d 45, 46 (Fla. 1973) (defining assault as "`an intentional, unlawful threat by word or act to do violence to the person of another coupled with an apparent ability to do so, and doing some act which creates a well founded fear of such violence being done'" (quoting Wilson v. State, 265 So.2d 411, 413 (Fla. 4th DCA 1972))).
[3] Although the Swift opinion relies upon the erroneous language from Shorette regarding "a specific intent to do violence," 973 So.2d at 1199, its reasoning is ultimately correct. This court examined the evidence to determine whether it would have permitted the jury to find that Mr. Swift knew Officer Sweat had run behind the SUV because in the absence of such evidence, there was no basis for the jury to conclude that Mr. Swift had intentionally threatened the officer. Id.
[4] Under Mr. Pinkney's reasoning, anyone who points a gun, brandishes a knife, or drives his car toward a police officer to avoid apprehension cannot be guilty of aggravated assault. On the contrary, such threats in an attempt to elude apprehension are quintessential examples of aggravated assault on a law enforcement officer. See, e.g., Williams v. State, 597 So.2d 377 (Fla. 2d DCA 1992); Nelson v. State, 753 So.2d 648 (Fla. 3d DCA 2000); Wallace v. State, 688 So.2d 429 (Fla. 3d DCA 1997); McGee v. State, 687 So.2d 22 (Fla. 5th DCA 1996); Mitchell v. State, 611 So.2d 1269 (Fla. 3d DCA 1992).
[5] The majority opinion suggests that Mr. Pinkney's theory of defense was that of mistaken identity and that this somehow limits his argument on his motion for judgment of acquittal. First, as is his constitutional right, Mr. Pinkney presented no evidence and did not testify. I acknowledge that Mr. Pinkney's attorney did question whether the State's evidence proved beyond a reasonable doubt that Mr. Pinkney was the person who committed the crime. However, this was a reasonable doubt argument based on the inconsistencies in the State's testimony and what defense counsel maintained was a lack of evidence. His argument was that the evidence presented by the State proved nothing beyond a reasonable doubt.

In the portion of defense counsel's closing argument quoted by the majority, counsel was clearly referring to Mr. Pinkney when he described the driver as a sixteen-year-old juvenile. The record shows that Mr. Pinkney's date of birth is November 12, 1990, and the date of the incident was October 1, 2006. I therefore conclude that counsel's closing was not a mistaken identity argumenti.e., that Mr. Pinkney was really somewhere else and the witnesses identified the wrong person but rather was that the evidence was so inconclusive that the jury could not find beyond a reasonable doubt that the State had proved that Mr. Pinkney had committed the offenses with which he was charged.
But even if the defense did argue mistaken identity, that does not alter the scope of this review. Mr. Pinkney's argument for judgment of acquittal was that the State had failed to prove "that there was any intent on the part of Mr. Pinkney to assault Officer Zammitt." It is at the close of the State's case that the trial court must weigh the circumstantial evidence presented by the State against a reasonable hypothesis of innocence. See Bussell v. State, 66 So.3d 1059, 1061 (Fla. 1st DCA 2011) ("Our review is limited to whether the evidence the State presented in [its] case-in-chief was legally sufficient."). Once the trial court denied that motion, Mr. Pinkney was not precluded from asserting a mistaken identity defense or any other defense during his case. The trial court's error occurred in failing to recognize the insufficiency of the State's evidence at the end of the State's case. The fact that counsel argued mistaken identity in closing argument does not waive the argument that the State failed to prove the required statutory elements.