CANADY, J.,
dissenting.
Because I disagree with the Court’s conclusion that there is insufficient evidence to support the jury’s verdict of guilt in this case, I respectfully dissent. While the verdict of guilt rests on circumstantial evi *753 dence, the permissiblé inferences from the evidence are sufficient for a rational trier of fact to conclude that the State proved Appellant’s guilt beyond a reasonable doubt. As we have said many times, whether the evidence “exclude[s] all reasonable hypotheses of innocence is for the jury to determine.” State v. Law, 559 So.2d 187, 188 (Fla.1989). The majority has in effect reweighed the evidence and substituted its judgment on the weight of the evidence for that of the jury.
The associate medical examiner testified that the immediate cause of death was “sharp force injury.” The victim suffered a stab wound that severed her aorta and another that severed her jugular vein. There were bruises on the victim’s neck-showing she was also strangled manually. There were no defensive knife wounds. These findings supported the conclusion that the manual strangulation was inflicted first, rendering the victim unconscious, and then the fatal stab wounds were inflicted. The autopsy showed that the victim suffered a fractured hyoid bone and there was petechial and subconjunctive hemorrhaging in the eyes. These findings, in the pathologist’s opinion, indicated that the victim was conscious and struggled against the attack before losing consciousness due to oxygen deprivation.
Material was scraped from under the fingernails of the murder victim, Teresa Lodge. Upon examination, some of the material from under the fingernails on Lodge’s left hand was found to be human tissue containing DNA. Whether the material was skin, blood, or some other human tissue is immaterial. Any DNA found there that was not her own had to have come from someone else. A forensic pathologist testified that normal activities such as bathing and washing can remove foreign DNA from the body and that DNA is subject to degradation from contact with moisture, bacteria, chemicals, and other material in the environment. When DNA is present but degraded, it provides a less than complete profile. The material removed from under the fingernails of the decedent’s left hand was described as “robust,” by which the examiner meant that it was not degraded and it provided an intact length of DNA that could be examined on all thirteen loci. The DNA material obtained from the body' of Teresa Lodge matched Appellant’s DNA on all thirteen loci.
Teresa Lodge worked as a restaurant manager and cook. Several employees of the restaurant — including some who had worked with her for years — testified that Lodge was very conscientious about keeping the cooking implements and food preparation surfaces clean. Her routine included washing pots and pans by hand throughout the day. There were three sinks for washing pots and pans by hand. First Lodge would scrub the pots and pans in very hot water and detergent, making sure to scrape off any adhered bits of food. Then they were submerged in a second sink filled with hot water, containing a sanitizing solution. Finally they were rinsed in a third sink filled with clean hot water. Each step required submerging the pot or pan completely. The witnesses also testified that Lodge cleaned the grill and other work surfaces numerous times throughout the work day using a sanitizing cleanser and washed her hands repeatedly-throughout the. day. She never wore rubber gloves when performing these kitchen cleaning tasks.
Lodge worked at the restaurant on Monday, Tuesday, and Wednesday, September 25-27, -2006. On Wednesday, she trained a new kitchen employee. The employee testified that Lodge trained her in the food-handling and kitchen hygiene requirements of the restaurant. The new *754 employee testified that Lodge demonstrated the use of the three sinks for washing and sanitizing pots and pans and showed her how to clean the cooking and work surfaces in the kitchen. These tasks were to be done repeatedly throughout the day. And most importantly, Lodge trained her new employee in the importance of hand washing, which was required before and after touching any raw or cooked food product, to avoid “cross-contamination,” and after performing any washing or cleaning task. There was a separate sink in the kitchen for hand washing. Hand washing was done with soap and hot water. Lodge trained the new employee to wash between the fingers, to scrub under the fingernails, and to wash all the way up to the elbows. Lodge washed her hands repeatedly that Wednesday morning using these methods.
On the morning of Wednesday, September 27, Lodge not only trained the new employee in these cleaning methods, but demonstrated them because there were several pans in which prepared food had been refrigerated overnight. The pans were to be used with a steam table for serving soups, chili, and gravy. The food from the day before had to be removed and the pans cleaned. Some of the pans had food stuck to them that had to be scrubbed off using hot water and detergent. That morning, Lodge and her new assistant cooked bacon, sausage, potatoes, grits, biscuits, and eggs, cleaning their work surfaces and implements as they worked. Lodge cleaned the inside of the microwave. When a surface had adhered food or debris not accessible to a scraping or scrubbing tool, Lodge scraped the material off with her fingernails. Of course, after any such task, she washed her hands. Later that morning, Lodge left the restaurant for a doctor’s appointment. Although she was expected to return to the restaurant that day, she did not. She did not show up for work on Thursday, the day her body was found. As the majority opinion states, Lodge was probably killed some time between 2:30 p.m. on Wednesday and 5:30 a.m. Thursday.
When detectives first interviewed Hodg-kins, he admitted that he knew Lodge, claimed to have dated her in the mid-1980s, and said he had only seen her a few times since then. He said that the last time he had seen her was about six to eight weeks before the murder, when she greeted him at a Circle K convenience store/gas station with a friendly hug. Other than seeing her briefly a few times at the restaurant where she worked, he said the only other times he had seen her were in 2004, when he stopped by to see her, accompanied by his adult son, and found she was staying in a different apartment than previously because her apartment had been damaged by a water leak. He saw her again in late 2004, he said, when she was back in her original apartment, but he did not go inside. He visited her out in front of the building. He denied ever entering the apartment where Lodge was living at the time of her death. He claimed their relationship was always friendly.
When detectives interviewed Hodgkins a second time, they confronted him with information they had obtained from the apartment complex manager that the water damage repairs to Lodge’s apartment were done in the summer of 2006, not in 2004. Hodgkins responded that he might have been mistaken about the dates. When the detectives told him his DNA had been found under Lodge’s fingernails, he told them that when he saw her at the Circle K and she hugged him, she put her hand up the back of his shirt and scratched his back. After the detectives suggested that casual contact like that would not cause a transfer of DNA, Hodg- *755 kins admitted that he had.seen Lodge a-month to a month and a half before her death, they had sex, and she scratched his back hard enough that he felt stinging later when he showered. He admitted that he had seen her both at the other apartment where she was staying temporarily and at the apartment where she was living at the time of her death and that these visits were in the months preceding her death, not in 2004. When the detectives told him the DNA would not remain on her hands that long because of her habit of keeping her hands clean, he finally stated that he had sex with her “three days prior to her being killed” and that she scratched his back “real hard.” Hodg-kins told the officers he had learned of Lodge’s death on the television news. The body was discovered on September 28. As the majority opinion indicates, presumably he meant their last contact was on or about Monday, September 25. When the detectives asked Hodgkins why he had lied, he said he did not want his wife to find out about his having sex with Lodge and because he was afraid he would be suspected of the murder.
Melanie Zakel testified that she visited Lodge the night of Monday, September 25. Some time after midnight, there was a knock at the door. Lodge opened the door, and from the tone of her voice in speaking to the person at the door, Zakel detected “a little bit of uneasiness,” so she moved to where she could see who was at the door. She identified Hodgkins as the person she saw at Lodge’s front door. Hodgkins looked at Zakel and seemed displeased that she was there. Lodge did not invite him in, and after he left it seemed to Zakel that Lodge “was a little bit aggravated” by the visit. Except for the identification of Hodgkins, Zakel’s testimony about this incident was based on her perceptions of tone of voice and facial expressions. The credibility and weight of this evidence was for the jury to determine. If the jurors believed it, they could have found it was in conflict with Hodgkins’ claim that he and Lodge were on friendly terms and had consensual sex at her apartment on or around that day as he claimed in his final statement. This inference from the evidence is inconsistent with the factual claim in Hodgkins’ final statement and provides a basis for the jury to reject his hypothesis of innocence.
As we stated in Law, “[t]he state is not required to ‘rebut conclusively every possible variation’ of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant’s theory of events.” 559 So.2d at 189 (footnote omitted) (quoting State v. Allen, 335 So.2d 823, 826 (Fla.1976)). The theory of events asserted by Appellant, based on his final statement to the police, is that his DNA was found on the victim’s body because of their interaction three days before her death and that he lied to the police about how recently and how frequently he had seen the victim because he did not want his wife to find out and was afraid he would be accused of the murder. However, if Hodgkins had told the officers his final story when they first questioned him, there is no reason his .wife would have found out. He also clarified that he was not married at the time of the murder and had only been married a few weeks when the police first questioned him, which was over a year after the murder. It is still plausible that he did not want his wife to find out, but the import of this information and its weight were for the jury to determine.
A jury is permitted to draw reasonable inferences from the evidence. See, e.g., Walker v. State, 957 So.2d 560, 578 (Fla.2007). False statements to the police can be material evidence because of what they *756 tell the jury about a defendant’s state of mind when making the statements. See, e.g., United States v. Holbert, 578 F.2d 128, 129 (5th Cir.1978) (“[A] long line of authority ... recognizes that false exculpatory statements may be used ... as substantive evidence tending to 'prove guilt.”); Simpson v. State, 562 So.2d 742, 745 (Fla. 1st DCA 1990) (observing that a defendant’s false statement “would have been admissible in the State’s case as substantive evidence tending to affirmatively show a consciousness of guilt”), review denied, 574 So.2d 143 (Fla.1990). The way Appellant’s story changed in response to the detectives’ statements to him is a circumstance the jury could properly take into consideration in weighing the .evidence. Appellant’s final statement to the police is the source for his theory or hypothesis of innocence, and the inconsistencies in his statements are a valid basis for the jury to discount the credibility .of that final statement. See Orme v. State, 677 So.2d 258, 262 (Fla.1996).
The majority opinion notes that Hodg-kins’ fingerprints were not found in the victim’s apartment, even though eighteen prints were lifted and not identified. The absence of his fingerprints does not detract from the evidentiary basis for the jury’s verdict,-since a perpetrator can take steps to avoid leaving prints. There was testimony that Lodge’s friends and coworkers frequently visited -her apartment, so it is not surprising that there were a variety of unidentified prints. If Hodgkins had recently visited the apartment with Lodge’s consent as he claimed, it would be surprising for his prints not to be found there. This too is a factual circumstance the jury could have considered..
The majority opinion refers to the cross-examination of the State’s DNA expert,- in which she conceded the validity of an article published in' a scientific journal. The article described a study in which test subjects self-reported their routine daily activities over a forty-eight-hour period and then their fingernails were tested for the presence of DNA. The study concluded that DNA can be transferred through a variety of activities, including interpersonal relations ranging from casual to intimate contact, and can- remain despite washing and bathing. The fact that DNA can be transferred by ordinary daily activities and can remain under the fingernails for days despite routine hand-washing does not compel the conclusion.that Hodg-kins’ DNA could remain under Lodge’s fingernails for three days despite her extraordinary activities. This was a matter for the jury, and the jury could have concluded that the intensity and frequency of Lodge’s hand-washing and dishwashing activities and the evidence that she engaged in these activities for three days before she died made her situation different from the routine hand-washing discussed-in the article. In any event, if foreign DNA is so easily transferred through casual contact and can remain for days despite frequent hand-washing, the jury might have expected to .find other DNA under Lodge’s fingernails, not just Hodgkins’ and Lodge’s.
For three days before she died, including the- morning of the day she was last heard from by coworkers, Teresa Lodge washed pots and pans in detergent and hot water, submerged them in more hot water and sanitizing solution, and rinsed them in hot water. She cleaned a grill and work surfaces with hot water and a sanitizing solution. She handled raw food, and she washed her hands repeatedly throughout the day. She was known for washing her hands thoroughly before and after handing food and after performing a cleaning task and was seen - doing so repeatedly that morning. The expert testimony that contact with moisture, chemicals, or bacteria degrades the condition- of DNA and that *757 the DNA sample collected from the body was intact, combined with testimony that Lodge engaged in the work routines described above for the three days immediately before her. death, would justify a jury’s conclusion that the DNA under her fingernails was deposited there after the last morning she worked at the restaurant and not three days before as posited by the defense hypothesis of innocence. This evidence was sufficient to rebut the theory that, as Appellant claimed in his final statement to police, his last interaction with Lodge was three days before her death and involved- scratching during sex, because it was reasonable for the jury to conclude it. was highly unlikely that an intact, “robust” amount of his DNA would have remained under her fingernails for that period of time under the circumstances.
Teresa Lodge was left-handed. Tt was reasonable for the jury to infer that she would have used her left hand to try to defend herself. The biological material from which an intact sample of DNA was 'obtained was scraped from under the fingernails of her left hand. The jury could reasonably conclude that the biological material found under her fingernails after her death was deposited there when she struggled against the attack that ended her life. In light of the evidence .that Lodge was conscious when her attacker began to strangle her, it was reasonable for the jury to infer that DNA from Hodgkins’ body got under her fingernails when she tried to fend off the attack. It was reasonable for the jury to conclude that the person she scratched was the one who strangled her into unconsciousness and then stabbed her. The reasonable conclusion is that Appellant was with her at the time of her death and he was her killer.
The nature of the acts that caused Teresa Lodge’s death were a sufficient basis for the jury to find that the murder was premeditated.
I find that Appellant’s other claims on appeal are without merit and would affirm the conviction of first-degree murder. I also would uphold the trial court’s sentencing findings and the sentence of death, which is proportional to the offense in light of all the circumstances..