DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**EDWARD JERMAINE BABBS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D12-1425

[March 23, 2016]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Bernard I. Bober, Judge; L.T. Case No. 09-20236CF10A.

Kevin J. Kulik of Kevin J. Kulik, P.A., Fort Lauderdale, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Nancy Jack, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

This case involves the murder of a young pregnant woman and her fetus, which was viable at the time of her death. Appellant was the biological father of the unborn child. The victim was discovered in a car parked in a parking lot. She had been shot once in the head and once in the abdomen. Appellant is currently serving a life sentence without the possibility of parole. Appellant argues that the state's evidence was insufficient to support the trial court's denial of his motion for judgment of acquittal. Because the State presented competent, substantial evidence inconsistent with appellant's theory of innocence, we affirm.

"The standard of review for the denial of a motion for judgment of acquittal is de novo." *Ortiz v. State*, 36 So. 3d 901, 902 (Fla. 4th DCA 2010) (citing *Pagan v. State,* 830 So. 2d 792, 803 (Fla.2002)). "If after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.'" *Garrido v. State*, 97 So. 3d 291, 298 (Fla. 4th DCA 2012) (quoting *Williams v. State,* 59 So. 3d 373, 375 (Fla. 4th DCA 2011)).

Because there were no witnesses to the shooting and no outright confession, this case involves circumstantial evidence. "When the evidence against a criminally accused person is circumstantial, a motion for judgment of acquittal should be granted if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." *Brothers v. State*, 853 So. 2d 1124, 1125 (Fla. 5th DCA 2003). In such circumstances, "the proper task of the trial judge is to review the evidence, taking it in the light most favorable to the state, in order to determine whether there is competent evidence from which the jury could infer guilt to the exclusion of all other inferences." *Martin v. State*, 728 So. 2d 775, 776 (Fla. 4th DCA 1999) (citing *State v. Law*, 559 So.2d 187, 189 (Fla.1989)). "The State is not . . . required to rebut every possible scenario which could be inferred from the evidence. Rather it must introduce competent evidence which is inconsistent with the defendant's theories." *Schwarz v. State*, 695 So. 2d 452, 454 (Fla. 4th DCA 1997) (citing *Law*, 559 So. 2d at 189).

The state's evidence put appellant at the scene at the time of the murder. The state also presented statements made by appellant showing consciousness of guilt, and evidence to suggest a motive. Appellant had expressed frustration about the victim's decision to go forward with the pregnancy. He told her that she "was ruining his life" and that "he didn't want anything to do with it and that she should just get rid of it."

The victim's body was discovered at approximately 5:00 p.m. on October 2, 2009, in a parked car in the parking lot of a Winn Dixie shopping plaza. The medical examiner reported to the scene at about 11:00 p.m., and immediately noticed a gunshot wound to the victim's abdomen. The medical examiner estimated a 24-hour period of when death occurred. A second gunshot wound to the back of the victim's skull was discovered during the autopsy.

The victim was last seen by her cousin, Jovanna Boyd, the night before. After receiving a text message, the victim left in a red Ford Taurus—the same car in which her body was found. Boyd did not know where the victim was going. Boyd called and spoke with the victim at about 10:53 p.m., during which she heard a male voice in the background. Boyd told the victim to "beat her home."

At around 12:10 a.m., the victim still had not come home. Boyd called the victim's phone a number of times, all of which went unanswered. Boyd called appellant at 1:06 a.m. and asked if he had seen the victim. Appellant told Boyd that the victim had left a little while ago—about 11:00 p.m. Appellant also mentioned that the victim had left her phone with him.

Earlier, on the evening of October 1, appellant went to a high school football game with two friends, Ismael Sierra and Denzel Chandler. Sierra and appellant were in joint possession of two guns which they kept in a Spider-Man book bag. One of the guns was a semi-automatic, which they were holding for a friend, and the other was a revolver, which Sierra and appellant co-owned. While at the game, appellant purportedly got into an altercation with an individual by the name of Jameal.

After the game, around 10:30 p.m., Sierra, Chandler, and appellant went to another friend's house. Chandler and appellant left after no more than 15 minutes. Sierra did not see the revolver after appellant left. Chandler dropped appellant off at his house around or before 11:00 p.m.

At 12:26 a.m., appellant called Sierra asking for a ride. Sierra was unable to help because his car was not working. At 12:29 a.m., appellant called Chandler asking for a ride. Appellant said that he was at the Southwest Broward Junior Athletic Association, but that Chandler could pick him up at a nearby McDonald's. The Winn Dixie where the victim's body was found was located off the same street as the athletic association.

Chandler drove appellant straight home, and along the way, asked him where he had been. Appellant said that he was "at his chick's house." When they got to appellant's house, appellant threw the revolver down on the seat of the car and told Chandler to "hold it down for him."

When Sierra spoke with appellant the next day, appellant told Sierra that if anybody asked, to tell them appellant was with him from 11:00-12:00 the night before. Later that day, Sierra spoke with appellant's stepdad and told him that appellant had been with him the night before. After Sierra found out about the murder, he called appellant's stepdad and told him that he had lied and that appellant had asked Sierra to say that he was with him.

When Chandler heard that appellant was being questioned about the murder, he threw the gun in a nearby lake, so as not to have any involvement with the situation. Chandler later told law enforcement about the gun, and accompanied them to the lake to show them exactly where he threw it.

The revolver was recovered from the lake on October 13. Four .22 caliber long rifle cartridges were found inside the gun. These were live rounds. Also inside the gun were two shell casings, indicating that two bullets had been discharged. Although the gun initially appeared to be inoperable, it was made functional and test fired with similar ammunition to that of the projectile taken from the victim's abdomen. The projectile was determined to be consistent with the type of ammunition that would

be within one of the .22 caliber casings in the revolver. A cartridge of the same make and caliber as those found in the revolver was also recovered during a search of appellant's bedroom.

The cell phone records of both appellant and the victim also supported the state's case. From 9:53 – 10:20 p.m. on October 1, 14 text messages were exchanged between the appellant and the victim. No outgoing calls were made from appellant's phone between 10:36 p.m. and 12:26 a.m. There were only incoming calls. An incoming call on appellant's phone at 12:06 a.m. pinged off a cell tower within a 2 mile radius of where the victim's body was found. The 12:26 a.m. call to Sierra and the 12:29 a.m. call to Chandler both pinged off cell towers less than 2 miles from where the body was found.

Although appellant did not put on a case at trial, his hypothesis of innocence was that the evidence did not show that he killed the victim. He made a number of statements to law enforcement over the course of the investigation, admitting that he was with the victim the night of the murder, but asserting that he had parted ways with her by 11:00 p.m. Appellant also tried to suggest Jameal—the individual with whom he got into an altercation at the football game—as an alternate suspect. The only evidence to support this possibility was a statement appellant made to Monisha Dawkins that he saw the victim leave the football game with a guy named Jameal. The reasonableness of this hypothesis was weakened by Boyd's testimony that the victim was with her all day until the victim left that night in the red Ford Taurus.

In light of the state's evidence of appellant's statements to Sierra and Chandler, the phone records placing appellant in the vicinity of where the victim's body was found, the consistency of the two shell casings with the projectile taken from the victim's abdomen, and appellant's conduct with the revolver, appellant's theory that "Jameal did it" was not a reasonable hypothesis of innocence. Accordingly, there was no error in the denial of appellant's motion for judgment of acquittal.

LEVINE and CONNER, JJ., concur.

\*        \*        \*

***Not final until disposition of timely filed motion for rehearing.***