ON MOTION FOR REHEARING

SAWAYA, J.
The State has filed a Motion for Rehearing. That motion is denied. We have, however, decided to clarify our opinion, so we withdraw the previously rendered opinion and substitute the following.
This case involves a fatal collision between a sport utility vehicle (SUV) and motorcycle that is so unusual, the State’s accident reconstructionist said it could only happen in a Hollywood movie. As a result of this accident, Harley Pennington, the driver of the SUV, was convicted of DUI manslaughter and leaving the scene of an accident with death.[1] Pennington appeals, *195 arguing that (1) the trial court erred in denying his motion for judgment of acquittal because his reasonable hypothesis of innocence regarding how the accident happened was unrebutted; and (2) the trial court erred in denying his motion for mistrial made on the basis of juror misconduct.
The tragic result of the collision, which occurred in the early morning hours of January 14, 2007, is that the driver of the motorcycle was killed. The unusual factor in this accident is that the evidence, specifically motorcycle tire tracks over the top of the SUV and the unique damage to the motorcycle, established that the motorcycle had actually ridden up and over the top of the SUV. Because there was no damage to the front forks of the motorcycle, which all experts agreed would have been damaged in a frontal collision, but there was extensive damage to the undercarriage of the motorcycle, the State’s accident reconstructionist testified that one of two possible explanations was that the motorcycle was in a wheelie position at the moment of impact. Pennington’s accident reconstructionist concluded from the evidence that the motorcycle had to have been doing a wheelie. Pennington’s argument is that even if he had not been under the influence of alcohol, the fact that the motorcycle was in wheelie position meant that its headlight was cast skyward and therefore he could not have seen the motorcycle coming in the dark before he began his left turn in front of it. Thus, he argues, the fact that he was driving under the influence of alcohol did not cause or contribute to the death of the decedent and he could not be guilty of DUI manslaughter under section 316.193(3)(c)8., Florida Statutes (2007). That statute requires that in order to convict an individual of DUI manslaughter, the State must prove that the individual operated a vehicle while under the influence of alcohol to the extent that his normal faculties were impaired or with an unlawful blood alcohol level, and that as a result of such operation, the individual “eause[d] or eontrib-ute[d] to causing ... [t]he death of any human being .... ” § 316.193(3)(c)3., Fla. Stat. (2007).
Neither driver was a model operator of his vehicle. Pennington was driving his SUV while intoxicated. The decedent had purchased his new, high-performance, sport motorcycle, which had more horsepower than most small sedans, just eleven days earlier. He had alcohol in his bloodstream at the time of the collision and was not licensed to drive the motorcycle in the first instance. According to witnesses who testified to what they observed of the two vehicles shortly before the collision, Pennington was weaving within his lane, but did not stray from the lane. The decedent was observed shortly before the accident driving his motorcycle approximately 80 to 90 miles per hour in a 45-mile-per-hour speed zone; he almost hit another vehicle as he sped by and cut in front of it at a very high rate of speed; and he was not wearing a helmet.
Because there were no eyewitnesses to the collision, it was necessary to attempt to determine how the accident happened through the testimony of accident reconstruction experts, who drew inferences and conclusions from their analysis of the evidence collected from the scene. In this very unusual case, this proved to be any *196 thing but an exact science. Trooper Koe-nig, an accident reconstructionist for the Florida Highway Patrol called by the State, was able to identify two possible ways in which the motorcycle could have crossed the top of the SUV as shown by the evidence-the motorcycle was either in wheelie position when it hit the SUV or the motorcycle had hit the front tire of the SUV and then launched onto the SUV. He had never seen either type of occurrence before. He described the wheelie scenario as “rare” and the tire impact theory as “very rare.” Importantly, he admitted that under the tire impact theory, he would have expected to see damage to the tire of the SUV and there was none. He agreed that the absence of damage to the front forks of the motorcycle was consistent with a motorcycle in wheelie position. In the final analysis, Trooper Koenig did not know why the motorcycle rode up over the SUV.
Specifically, Trooper Koenig, who described the accident as involving “such an angled impact” and “somewhat of a glancing blow,” testified:
The fact that the motorcycle was either doing a wheelie, which is rare — if that’s the case, this is the first case I’ve ever had where that occurred — or if the impact itself caused it, if it hit the tire on the SUV first and that caused it to be vaulted up the side of the SUV — don’t know why it ended up going over the roof of the SUV.
The prosecutor continued questioning:
Q. You indicated that one possible explanation is that he was doing a wheelie, but is that the only explanation for this?
A. Once again, it’s possible that it just could have rode up based on the type of impact it was. That’s the stuff you usually see in Hollywood movies. Very rarely do you see that in real life. That would be a first, also, for me. I never had-all the scenes I’ve been at, I never seen a motorcycle travel over the roof of a car like it did in this case.
When asked how a glancing angle impact could have caused the motorcycle to go up over the hood of the SUV, Trooper Koenig stated:
Once again, it would be an extremely rare occurrence. Like I said, something you usually see in a movie, not real life. The only way it could have happened as a result of impact is the motorcycle struck something that was below its center of gravity to begin with and that would cause it to rise up; the wheel would rotate over the initial impact area.
The “something” to which he referred would have been the tire of the SUV. However, he admitted that there was no evidence of that having happened; had that occurred he would have expected to have seen damage to the SUV tire and, again, there was none.
Trooper George Diaz presented to the jury photographs apparently showing tire tracks from the right front of the roof of the SUV, across the top, and off the left rear of the SUV. FHP’s calculations placed the motorcycle’s speed at about 58 miles per hour. This trooper is not certified in accident reconstruction. Trooper Diaz and Trooper Koenig had discussed the possible ways in which the accident could have occurred, including whether the motorcycle had been doing a wheelie at the time of the crash. According to the evidence, their only theory was that the motorcycle had been “upright” (meaning on its back tire) when it “slapped” the SUV. The tire marks on the top of the SUV showed the motorcycle had run across the roof and vaulted off the SUV. They could not prove how the accident had occurred. Trooper Diaz agreed that, assuming the motorcycle had been in a wheelie position, *197 the headlight would have been pointed into the sky.
The only witness who testified with certainty concerning how the accident happened was Christopher Stewart, an expert in accident reconstruction called by Pennington. Mr. Stewart relied on over 300 photographs taken by the Florida Highway Patrol and the FHP measurements and read the depositions of all involved. Mr. Stewart determined that the motorcycle had been in a wheelie position; he reached that conclusion based upon the damage to the underside of the motorcycle and the lack of damage to the front forks of the motorcycle. In a typical motorcycle collision, where the front wheel is on the ground, the forks hit first and cave under into the radiator. That is the damage profile for the typical motorcycle collision. However, in this case, the front forks were undamaged, but there was significant damage to the frame that was caused by the motor being pressed in. The frame had cracked, there was significant damage to the pipes, and the fuel tank was dislocated. The tire marks on the upper portions of the SUV and the impact marks and deformations on the top of the SUV also supported his conclusion that a wheelie was being performed.
Mr. Stewart was able to perform a vault equation and determined that the launch angle was 85 degrees. The launch angle is not necessarily the angle at which the motorcycle was traveling while in wheelie position, but is the angle of the motorcycle when the motorcycle’s engine hit the A-pillar of the SUV, dented the door, crushed the windshield and began to rotate — the center of gravity of the motorcycle came up. He did not know the exact angle of the motorcycle at impact; the angle of impact had to be lower than 85 degrees. He would not place the impact angle at much lower, though, but “it could be a little less at impact, and then because of the collision, it’s gonna rotate the vehicle and launch it, center of gravity, through 85 degrees.”
When asked whether a 20-degree takeoff angle (the angle testified to as a possibility by the State’s witness) was possible, Mr. Stewart demonstrated why that could not be correct. A 20-degree angle would have put the motorcycle through the SUV, not over it. At a 20-degree angle, the front wheel would have been only a few inches off the ground and the front wheel would have made contact with the SUV and caused damage to the front forks. The evidence showed that the underbody of the motorcycle had hit the right front quarter panel of the SUV. His calculations showed that the motorcycle was traveling approximately 70 to 75 miles per hour when it hit the SUV. The wheelie could not have occurred as a result of the impact because, upon impact, the front wheel would have caved into the motor area-there are no forces in the collision that would drive the front wheel up. The wheelie had to have occurred prior to impact.
Mr. Stewart addressed the effect that being in wheelie position had on the headlight. He explained the distance the headlight is designed to cast light and how that is impacted when the motorcycle is on its back tire. The headlight illuminates approximately 200 feet in front of the motorcycle. The only way to know that a motorcycle is coming towards a person in the dark is to see its headlight. In wheelie position, the light from the motorcycle would not shine in a position that the SUV driver could have seen it and thus “there would be no visible clues from the motorcycle that it would be traveling towards you, if it’s in a wheelie stance.”
Pennington rested and once again moved for judgment of acquittal. Pen *198 nington argued that in this circumstantial evidence case, the State had failed to rebut the reasonable hypothesis of innocence and, under the unrebutted testimony that the motorcycle had been in wheelie position, headlight shining upward, even a sober driver could not have seen the motorcycle coming. The court denied the motion.
The jury found Pennington guilty of DUI manslaughter and leaving the scene of an accident with death. Post-trial, Pennington moved for a new trial, alleging as one of the grounds that juror misconduct occurred when one of the jurors told other members of the jury that the motorcycle was equipped with a device that would have prevented it from doing a wheelie. At the hearing ordered several weeks after the trial, the deputy assigned to the trial testified that after the jury was discharged, he had been approached by a juror who told the deputy that he did not believe the motorcycle had done a wheelie because he had noticed in the pictures that there was something like a spoiler on the back that would have prevented a wheelie. The juror also told the deputy that the rest of the jurors were glad he was there because they did not know anything about motorcycles. Testimony of Mr. Stewart was admitted revealing that there was a device on the motorcycle, but it was not one that would have prevented the motorcycle from doing a wheelie. The device that is on the motorcycle “extends the rear control arms and places the rear wheel farther back. The motorcycle had more than enough power to do a wheelie if the rider wanted to do one.” He added that there is another type of device, called a “wheelie bar,” that does prevent a motorcycle from doing a wheelie, but that device was not present in any of the 800 photographs of the motorcycle.
The court ordered a juror interview. That interview was held nine months after the trial, and the juror advised the court he did not recall specifically what he told the deputy or the other jurors. The juror did testify, “When I reviewed the pictures, I rendered my own humble, personal opinion that it appeared that the bike had an extended rear swing arm.” When asked whether he specifically told the jury that the swing arm would make it impossible to do a wheelie, he testified that he did not recall “but you can do wheelies with a — an extended rear swing arm, but it’s extremely difficult.” Thereafter, the following exchange took place between the prosecutor and the juror:
Q. Okay. Did other members of the jury seem to know what the purpose of the extended rear swing arm was?
A. I was basically the only person that had ever ridden a motorcycle on that jury.
Q. And you were giving your own personal experience based on your extensive knowledge of motorcycles?
A. My own humble opinion; yes, ma’am.
The juror also testified that he was not an expert on motorcycles or how they work. The record reveals that there was no evidence presented at trial regarding a wheelie bar or an extended swing arm that would have prevented or made it difficult to perform a wheelie. This was not an issue at trial and was never addressed by the parties. The only expert opinion was rendered post-trial by Mr. Stewart that there was no wheelie bar and that the motorcycle had more than enough power to do a wheelie if and when the driver wanted to. Pennington filed a Second Amended Motion for New Trial, asserting that this juror had essentially acted as a witness in the case by importing his knowledge and opinion to other jurors. The *199 trial court denied the motion, and we are now presented with this appeal.
Turning to the first issue, the standard of review that applies when reviewing a motion for judgment of acquittal is de novo. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). “Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.” Id. (citations omitted). However, a more stringent standard applies in cases where the state’s evidence of guilt is wholly circumstantial. See State v. Law, 559 So.2d 187 (Fla.1989). “Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.” Id. at 188. In Law, the court further explained that “[a] motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.” Id. Taking the evidence in the light most favorable to the State, “[i]t is the trial judge’s proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences.... The state is not required to ‘rebut conclusively every possible variation’ of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant’s theory of events.” Id. at 189 (citations omitted) (footnote omitted). “Circumstances that create nothing more than a strong suspicion that the defendant committed the crime are not sufficient to support a conviction.” Cox v. State, 555 So.2d 352, 353 (Fla.1989); see also Delgado v. State, 948 So.2d 681, 690 (Fla.2006) (“ ‘Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, ... is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict.’ ” (quoting Orme v. State, 677 So.2d 258, 261 n. 1 (Fla.1996)).
The insurmountable problem for the State is that it adduced not a single shred of evidence that was inconsistent with the defense theory. The State’s witnesses could not rule out that the motorcycle was in wheelie position and the physical evidence was wholly consistent with that theory and that theory alone. The State’s expert accident reconstruetionist, Trooper Koenig, testified there were two possibilities that would explain how the motorcycle came to run across the top of the SUV without a frontal collision — either the motorcycle was in wheelie position, which he described as “rare,” or it hit the SUV’s front tire and came up, which he described as “very rare” and the type of occurrence portrayed in a Hollywood movie. He admitted, though, that the front tire theory was not supported by the evidence because, had that occurred, there would have been damage and marks on the SUV’s tire and there were none. Trooper Diaz testified that he and Trooper Koenig had discussed the possible ways in which the accident had occurred, including whether the motorcycle had been doing a wheelie at the time of the crash, and their conclusion was that the motorcycle had been “upright” when it “slapped” the SUV. Too, Trooper Diaz agreed that, assuming the motorcycle had been in a wheelie position, the head *200 light would have been pointed into the sky. This admission was consistent with the unrebutted expert testimony by Mr. Stewart (and, for that matter, logic and common experience) that, in wheelie position, the motorcycle headlight would not have been visible to Pennington, and Pennington would have had no way to see that the motorcycle was coming towards him in the dark.
The State disingenuously states that a third explanation was provided by Trooper Koenig for the accident, referencing his testimony on redirect, “If it struck something that was below the center mass of the tire to begin with, or the motorcycle, when it hit, it would automatically start to go up. And that’s a possibility.” However, on recross, defense counsel asked for a clarification whether Trooper Koenig was saying that the motorcycle may have hit something before it hit the SUV or if it struck something on the SUV. Trooper Koenig clarified that hitting a part of the SUV itself, and specifically the front tire, was what he meant. This was a reference to the tire impact theory that he admitted was not supported by the physical evidence at the scene.
Turning very briefly to the second issue, Pennington argues that the juror’s “extrajudicial information that [the decedent’s] motorcycle either could not do a wheelie, or would have had an extremely difficult time doing a wheelie, unfairly prejudiced the jury. In so instructing the jury, [the juror] essentially acted as an expert for the State.” Pennington further argues that this juror “provided the only evidence for the State that refuted Pennington’s hypothesis that [the decedent] was doing a wheelie at the time of the accident.” Pennington also asserts that he did not have the opportunity to confront this juror’s opinion or the ability to cross-examine the juror as a witness against him and that this was not even an issue raised at trial. Hence, Pennington concludes that he is entitled to a new trial.
The State contends that what the juror did inheres in the verdict and is not the subject of judicial inquiry. Alternatively, the State argues that the error is harmless. We conclude that our resolution of the first issue renders this issue moot, so we will not discuss it any further.
We recognize the tragedy that befell the decedent and his family. We do not have the words to impart the enormity of that loss. However, it is our duty to render a decision as the law tells us we must. To breach that duty would compound that tragedy with the tragedy of holding an individual accountable for a crime the State did not prove he committed. This we will not do. Certainly there was sufficient evidence that Pennington was intoxicated and drove his vehicle and the proper conviction is for driving under the influence of alcohol. What there was not, however, is evidence that his intoxicated driving caused or contributed to the motorcyclist’s death as required by section 316.193. We therefore reverse the conviction and sentence for DUI manslaughter and remand this case to the trial court to enter an amended judgment and sentence for driving under the influence. Pennington’s conviction and sentence for leaving the scene of an accident with death is affirmed.
AFFIRMED in part; REVERSED in part; and REMANDED.
GRIFFIN, J., and MARSTILLER, S., Associate Judge, concur.

. Pennington was charged in Count I with DUI manslaughter with failure to render aid or give information; in Count II with "vehicular homicide (failure to render aid or give *195 information)”; and in Count III with leaving the scene of an accident with death. The jury returned guilty verdicts on the lesser offenses in Count I of DUI manslaughter and in Count II of reckless driving. Pennington was found guilty as charged as to Count III. The court did not enter judgment on the reckless driving verdict because the court agreed that that offense was subsumed in the DUI manslaughter offense.